**Public Copy - Sealed Material Deleted**

ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 16-1285

---

ANR Storage Company, Petitioner,

v.

Federal Energy Regulatory Commission, Respondent, and

Northern States Power Company - Minnesota, *et al.*, Intervenors.

---

**INITIAL BRIEF OF APPELLANT ANR STORAGE COMPANY**

---

On Petition for Review of Orders of the Federal Energy Regulatory Commission

Mark Sundback
Kenneth Wiseman
William Rappolt
Andrews Kurth Kenyon LLP
1350 I Street, NW, Suite 1100
Washington, DC 20005
Tel: (202) 662-2700
E-mail:  msundback@andrewskurth.com

Counsel for Appellant ANR Storage Company

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

**1.    Parties, Intervenors, and Amici before the Federal Energy Regulatory Commission**

Alliant Energy Corporate Services, Inc.
ANR Pipeline Company
ANR Storage Company
Atlanta Gas Light Company
BP Canada Energy Marketing Corp.
Canadian Association of Petroleum Producers
ConocoPhillips Company
Consumers Energy Company
Integrys Gas Group
J. Aron & Company
Michigan Consolidated Gas Company
New Jersey Natural Gas Company
NJR Energy Services Company
Northern States Power Company-Minnesota
Northern States Power Company-Wisconsin
SEMCO Energy Gas Company
Sequent Energy Management, L.P.
Shell Energy North America (US), L.P.
Tenaska Gas Storage, LLC

**2.    Parties, Intervenors, and Amici before this Court**

ANR Storage Company
BP Canada Energy Marketing Corp.
Canadian Association of Petroleum Producers
Federal Energy Regulatory Commission
Northern States Power Company - Minnesota
Northern States Power Company - Wisconsin
Tenaska Gas Storage, LLC

i

**B.    Rulings Under Review**

The rulings of the Federal Energy Regulatory Commission under review are identified as follows:

1.    Opinion 538, *ANR Storage Co.*, Docket No. RP12-479-000, "**Opinion 538**," 153 FERC ¶ 61,052 (Oct. 15, 2015) (JA ___); and

2.    *ANR Storage Co.*, Docket No. RP12-479-001, "**Rehearing Order**," 155 FERC ¶ 61,279 (June 16, 2016) (JA ___).

**C.    Related Cases**

There are no related cases previously before this court or any other court or pending in this court or in any other court of which counsel is aware.

ii

## CORPORATE DISCLOSURE STATEMENT OF
## ANR STORAGE COMPANY

ANR Storage Company ("ANR"), a Michigan corporation, provides firm and interruptible open access natural gas storage services to customers under section 7(c) of the Natural Gas Act ("NGA") and Part 284 of the Federal Energy Regulatory Commission's ("Commission" or "FERC") regulations.  ANR's principal place of business is located in Houston, Texas.  ANR is a wholly owned subsidiary of TransCanada American Investments Ltd., which in turn is a wholly owned subsidiary of TransCanada PipeLine USA Ltd., which in turn is a wholly owned subsidiary of TransCanada PipeLines Limited, a Canadian public company incorporated in 1951 by a Special Act of Parliament of Canada and continued on June 1, 1979 under the Canada Business Corporations Act.  TransCanada PipeLines Limited is wholly owned by TransCanada Corporation ("TransCanada"), a publically traded company.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT OF  ANR STORAGE
     COMPANY ......................................................................... iii

GLOSSARY OF ABBREVIATIONS AND TERMS ......................................... xiv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................................2

STATUTES AND REGULATIONS ....................................................4

STATEMENT OF ISSUES .............................................................5

STATEMENT OF CASE AND FACTS ..................................................7

SUMMARY OF ARGUMENT ........................................................11

STANDING .........................................................................15

ARGUMENT ..........................................................................16

  A.    Standard of Review ...................................................16

  B.    FERC erred by finding that ANR failed to show that it lacked
        significant market power.........................................18

    1.    FERC erred in concluding that ANR's share, combined with
        its status as an incumbent storage provider, precluded ANR
        from receiving market-based rate authority.............................18

    2.    ANR demonstrated it lacks significant market power in the
        relevant markets based upon ANR's size in relation to the
        market. ......................................................27

    3.    FERC Erred by Requiring ANR to Demonstrate that There
        Was Not a Substantial Number of Facilities Among the Good
        Alternatives that Needed to Obtain a Part 284 Certificate Or
        Release Capacity........................................................30

        a.    FERC Repeatedly Has Used State-Regulated Storage in
            Calculating an Applicant's Share Without Considering
            Whether There was a Substantial Amount of Such
            Storage........................................................34

iv

      b.   FERC Erred By Failing to Account for How State-Regulated Storage Capacity Affects Demand and Prices for Federally-Regulated Storage ........................................................37

          i.   Intrastate Connectivity ...................................................39

          ii.  Retail Choice and Asset Management Agreements Allow Substitution of State Regulated Storage for Federally-Regulated Storage........................................41

          iii. Intervenors and Other Distributors use Exchanges and Flowing Supplies to Substitute State Regulated Capacity for Interstate Storage Services .......................................44

      c.   FERC Erred By Failing to Consider Circumstances Related to Michigan State-Regulated Storage Capacity and Canadian Storage Capacity..........................................49

      d.   State-Regulated Storage Providers and Capacity Subject to Capacity Release Are More Than Just Theoretically Available, They are Good Alternatives................................51

   4.   Dominion and NiSource....................................................56

   5.   Eaton Rapids .....................................................................58

   6.   Market Metric Calculations ...............................................59

   7.   Other Factors....................................................................60

   8.   ANR's Proposed Mitigation Measures ......................................63

CONCLUSION ...................................................................65

CERTIFICATE OF COMPLIANCE.....................................................66

CERTIFICATE OF SERVICE ..........................................................67

Attachment A

Attachment B

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines and Regulation of Negotiated Transportation Services of Natural Gas Pipelines*,
74 FERC ¶ 61,076 (1996) ............................................................7, 22, 28, 35, 63

*Ameren Illinois Co.*,
148 FERC ¶ 62,152 (2014) ........................................................................52

*Analysis of Horizontal Market Power under the Federal Power Act*, 138 FERC ¶ 61,109 (2012) ..........................................................26

*ANR Pipeline Co. v. FERC*,
771 F.2d 507 (D.C. Cir. 1985) ................................................................15

*ANR Pipeline Co. v. FERC*,
71 F.3d 897 (D.C. Cir. 1995) .............................................................17, 30

*ANR Storage Co.*,
8 FERC ¶ 61,059 (1979) ...................................................................44

*ANR Storage Co.*,
141 FERC ¶ 61,099 (2012) ................................................................7, 8

*ANR Storage Co.*,
146 FERC ¶ 63,007 (2014) ....................................................................8

*ANR Storage Co.*,
153 FERC ¶ 61,052 (2015) ............................................................................
1, 7-9, 11-13, 18-20, 22-23, 27-33, 35, 38, 48-51, 56-58, 60

*ANR Storage Co.*,
155 FERC ¶ 61,279 (2016) ...................... 1, 10, 13-14, 19, 27, 33, 51, 56, 59, 60

*Arlington Storage Co.*,
125 FERC ¶ 61,306 (2008) ................................................................21

*AT&T Corp. v. FCC,*
    236 F.3d 729 (D.C. Cir. 2001) ...........................................................16

*Blue Cross & Blue Shield United v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) .............................................................53

*Bluewater Gas Storage, LLC,*
    117 FERC ¶ 61,122 (2006) ..........................................................36, 52

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ....................................................................53-54

*Buckeye Pipe Line Co.,*
    50 FERC ¶ 63,011 (1990)) ................................................................29

*Buckeye Pipe Line Co.,*
    53 FERC ¶ 61,473 (1990) ...........................................................26, 53

*Canadian Ass'n of Petroleum Producers v. FERC,*
    254 F.3d 289 (D.C. Cir. 2001) ..........................................................16

*Capacity Transfers on Intrastate Natural Gas Pipelines,*
    75 Fed. Reg. 66,046 (2010) ...............................................................56

*Cent. New York Oil & Gas Co.,*
    116 FERC ¶ 61,277 (2006) ................................................................21

*Cent. Oklahoma Oil and Gas Corp.,*
    80 FERC ¶ 61,250 (1997) .................................................................35

*Central Illinois Public Service Co.,*
    1999 Ill. PUC LEXIS 186 (1999) ......................................................40

*Chestnut Ridge Storage LLC,*
    128 FERC ¶ 61,210 (2009) ..........................................................21, 35

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.,*
    912 F. Supp. 747 (D. N.J. 1995) .......................................................54

*Colonial Pipeline Co.,*
    92 FERC ¶ 61,144 (2000) .................................................................26

*Copiah Storage, LLC*,
121 FERC ¶ 61,272 (2007) ................................................................18, 22

*DTE Energy Trading, Inc*., DOE/FE Order No. 3029, FE Docket No.
11-129-NG (issued Nov. 4, 2011) .......................................................49

*DTE Gas Co*., DOE/FE Order No. 3228, FE Docket No. 12-175-NG
(issued Feb. 12, 2013) .........................................................................49

*The East Ohio Gas Co.*,
133 FERC ¶ 61,076 (2010) ...........................................................52, 55

*The East Ohio Gas Co.*,
144 FERC ¶ 61,102 (2013) ...........................................................52, 55

*Egan Hub Partners, L.P.*,
95 FERC ¶ 61,395 (2001) .............................................................24, 53

*Egan Hub Partners, LP*,
72 FERC ¶ 61,225 (1995) ....................................................................24

*Enstor Houston Hub Storage and Transportation, LP*,
123 FERC ¶ 61,019 (2008) .................................................................35

*Exxon Mobil Corp. v. FERC*,
571 F.3d 1208 (D.C. Cir. 2009) .........................................................15

*F.T.C. v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ...........................................................54

*Florida Gas Transmission Co. v. FERC*,
604 F.3d 636 (D.C. Cir. 2010) ...........................................................16

*Freebird Gas Storage, LLC*,
111 FERC ¶ 61,054 (2005) .................................................................52

*Georgia Pub. Serv. Comm'n*,
107 FERC ¶ 61,024 (2004) ...........................................................41, 55

*Gulf South Pipeline Co.*,
101 FERC ¶ 61,204 (2002) ...........................................................35, 37

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*,
884 F.2d 904 (6th Cir. 1989) ...............................................................54

*Koch Gateway Pipeline Co.*,
66 FERC ¶ 61,385 (1994) ......................................................................35

*Leaf River Energy Center, LLC*,
142 FERC ¶ 62,233 (2013) ....................................................................35

*Lee 8 Storage Partnership*,
73 FERC ¶ 62,185 (1995) ......................................................................52

*Liberty Gas Storage, LLC*,
127 FERC ¶ 61,221 (2009) ...............................................................25, 30

*Louisiana Pub. Serv. Comm'n v. FERC*,
772 F.3d 1297 (D.C. Cir. 2014) .......................................................17, 27

*Louisville Gas & Electric Co.*,
99 FERC ¶ 62,040 (2002) ......................................................................52

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...............................................................................15

*Magnum Gas Storage, LLC*,
134 FERC ¶ 61,197 (2010) ....................................................................35

*Michigan Consolidated Gas Co.*, Letter Order, Docket No. PR09-10
(issued May 21, 2009) ......................................................................25, 36

*Michigan Gas Utilities Corp.*,
117 FERC ¶ 62,045 (2006) ....................................................................39

*Mobay Storage Hub, Inc.*,
117 FERC ¶ 61,298 (2006) ....................................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................16

*National Fuel Gas Distribution Corp.*,
86 FERC ¶ 61,179 (1999) ......................................................................41

ix

*Natural Res. Def. Council v. EPA*,
  822 F.2d 104 (D.C. Cir. 1987) ............................................................16

*New York State Electric & Gas Corp.*,
  81 FERC ¶ 61,020 (1997) ...................................................................52

*New York v. Kraft Gen. Foods, Inc.*,
  926 F. Supp. 321 (S.D.N.Y. 1995) .....................................................53

*Orbit Gas Storage, Inc.*,
  126 FERC ¶ 61,095 (2009) ...................................................... 35-36, 57

Order No. 678, *Rate Regulation of Certain Natural Gas Storage
  Facilities*, FERC Stats. & Regs. ¶ 31,220 (2006) ...........................7, 28

Order No. 678-A, *Rate Regulation of Certain Natural Gas Storage
  Facilities*, 117 FERC ¶ 61,190 (2006) ..............................................63

Order No. 720-A, *Pipeline Posting Requirements under Section 23 of
  the Natural Gas Act*, FERC Stats. & Regs. ¶ 31,302 (2010) .............38

*Pac. Gas & Elec. Co. v. FERC*,
  306 F.3d 1112 (D.C. Cir. 2002) ..........................................................17

*Peoples Natural Gas Co.*,
  55 FERC ¶ 62,223 (1991) ...................................................................51

*Petal Gas Storage Co.*,
  66 FERC ¶ 61,339 (1994) ...................................................................24

*Petal Gas Storage, LLC*,
  97 FERC ¶ 61,097 (2001) ...................................................................24

*Petal Gas Storage, L.L.C.*,
  102 FERC ¶ 61,243 (2003) ......................................................... 23-24

*Petal Gas Storage, L.L.C.*,
  142 FERC ¶ 61,119 (2013) ..................................................................52

*Promotion of a More Efficient Capacity Release Market*,
  123 FERC ¶ 61,286 (2008) ..................................................................42

x

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ...............................................................54

*Rager Mountain Storage Co.*,
    152 FERC ¶ 61,098 (2015) ................................................................21

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................53

*Red Lake Gas Storage, LP*,
    102 FERC ¶ 61,077 (2003) ........................................................18, 23

*S. Star Cent. Gas Pipeline, Inc.*,
    133 FERC ¶ 61,057 (2010) ................................................................61

*Shell Energy North America (US), L.P.*, DOE Order No. 3086, FE
    Docket No. 12-25-NG (issued Apr. 23, 2012) ...................................49

*SEMCO Energy, Inc.*, DOE/FE Order No. 3142, FE Docket No. 12-
    95-NG (issued Sept. 18, 2012) .........................................................49

*Theme Promotions, Inc. v. News America Marketing FSI*,
    546 F.3d 991 (9th Cir. 2008) ............................................................54

*Transok, Inc.*,
    64 FERC ¶ 61,095 (1993) ................................................................52

*Transok, LLC*,
    93 FERC ¶ 61,031 (2000) ...........................................................52, 61

*Transok, LLC*,
    97 FERC ¶ 61,362 (2001) ................................................................52

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    512 F.2d 1264 (9th Cir. 1975) ..........................................................53

*UGI LNG, Inc.*,
    127 FERC ¶ 61,257 (2009) ...............................................................21

*UGI Storage Co.*,
    133 FERC ¶ 61,073 (2010) ............................................21, 52, 59, 63

*Union Gas Ltd.*, DOE/FE Order No. 3111, FE Docket No. 12-52-NG
(issued June 22, 2012) ......................................................................49

*United States v. Columbia Steel Co.*,
334 U.S. 495 (1948).........................................................................53

*United States v. E.I. DuPont de Nemours & Co.*,
351 U.S. 377 (1956).........................................................................54

*Unocal Keystone Storage, L.L.C.*,
100 FERC ¶ 61,310 (2002) ..............................................................52

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
7 F.3d 986 (11th Cir. 1993) .............................................................53

*W & M Properties of Conn., Inc. v. N.L.R.B.*,
514 F.3d 1341 (D.C. Cir. 2008).................................................17, 27

*Wagner v. Circle W. Mastiffs*,
732 F. Supp. 2d 792 (S.D. Ohio 2010) ............................................54

*Washington 10 Corp.*, Letter Order, Docket No. PR08-26 (issued Oct.
3, 2008) ...........................................................................................25

*Williams Pipe Line Co.*,
71 FERC ¶ 61,291 (1995)................................................................26

*Worsham-Steel Gas Storage, L.P.*,
119 FERC ¶ 61,128 (2007) ..............................................................52

*WPI-ESI Gas Storage, LLC*,
108 FERC ¶ 61,061 (2004)........................................................36, 52

*Wyckoff Gas Storage Co.*,
105 FERC ¶ 61,027 (2003)...............................................18, 20, 35

**Statutes**

5 U.S.C. § 706 (2012) ............................................................................16

15 U.S.C. § 717c (2012) ...........................................................................1

15 U.S.C. § 717r (2012)................................................................. 1, 15-16

18 C.F.R. § 284.8 ....................................................................43

# GLOSSARY OF ABBREVIATIONS AND TERMS

| | |
|---|---|
| ANR | ANR Storage Company (referred to in the record below as ANR Storage or ANRS) |
| Asset Management Agreements | Agreements by which a capacity holder releases some or all of their pipeline capacity to an "asset manager" who agrees to either purchase from, or supply the gas needs of, the capacity holder |
| BP Canada | BP Canada Energy Marketing Corporation |
| Commission | Federal Energy Regulatory Commission |
| Commission Orders | Opinion No. 538, *ANR Storage Co*., 153 FERC ¶ 61,052 (2015) and *ANR Storage Co.*, 155 FERC ¶ 61,279 (2016) |
| Daily Deliverability | The volume of natural gas that on a peak day can be withdrawn from a storage facility and delivered to the pipeline network |
| Detroit | DTE Energy Company and its natural gas storage affiliates, Michigan Consolidated Gas Company and Washington 10 Corp. |
| Displacement | A process by which a natural gas shipper can substitute natural gas at one point for natural gas at another point without actual transportation of the gas between the two points. Displacement may allow a natural gas shipper to ship gas against the direction of physical flow of a pipeline |
| Distributors | Local distribution companies, many of |

xiv

|  | which do not have authorization to render service under Part 284 of the Commission's regulations |
|---|---|
| Dominion | Dominion Transmission |
| Eaton Rapids | Eaton Rapids Gas Storage |
| Energy Marketers | Generally, entities that, *inter alia*, produce or buy natural gas and sell such gas to others |
| FERC | Federal Energy Regulatory Commission |
| HHI | Herfindahl-Hirschman Index |
| Market | Michigan, Ohio, Illinois, Indiana and western Ontario (referred to in the record below as the "Central Great Lakes Market" or "CGLM") |
| MichCon | Michigan Consolidated Gas Company, a local distribution company in Michigan |
| NGA | Natural Gas Act |
| NGPA | Natural Gas Policy Act |
| NiSource | NiSource, Inc. |
| Northern States | Northern States Power Company, a local distribution company;  It includes as appropriate Northern States Power Company - Minnesota and Northern States Power Company - Wisconsin |
| Opinion 538 | Opinion No. 538, *ANR Storage Co.*, 153 FERC ¶ 61,052 (2015) |
| Part 284 | 18 C.F.R. §§ 284.221 and 284.224 (2016) |
| Petition | ANR Storage Company's Petition for Declaratory Order Authorizing Market-Based Rates filed March 6, 2012 in |

|                     | Docket No. RP12-479 |
|---------------------|---------------------|
| Rehearing Order     | *ANR Storage Co.*, 155 FERC ¶ 61,279 (2016) |
| Rehearing Request   | Request for Rehearing of ANR Storage Co., Docket No. RP12-479 (filed Nov. 13, 2015) |
| Retail Choice       | A state regulatory paradigm by which retail customers may select their retail supplier of the commodity of natural gas rather than being precluded from selecting any provider other than the local distribution company |
| TransCanada         | TransCanada Corporation |
| Working Gas         | Gas in an underground storage facility which may be withdrawn and sold. Unlike Working Gas, Base Gas is needed to operate the facility and typically cannot be withdrawn under normal operating conditions |

## JURISDICTIONAL STATEMENT

ANR Storage Company's Petition for Declaratory Order Authorizing Market-Based Rates was filed March 6, 2012 in Docket No. RP12-479 ("Petition"). (JA ___). FERC has subject matter jurisdiction under 15 U.S.C. § 717c (2012).  FERC denied ANR's Petition on October 15, 2015,  Opinion No. 538, *ANR Storage Co.*, 153 FERC ¶ 61,052 (2015) ("Opinion 538") (JA ___). ANR timely sought rehearing of that order.  *ANR Storage Co.*, Request for Rehearing of ANR Storage Co., Docket No. RP12-479 (filed Nov. 13, 2015) ("Rehearing Request") (JA ___).  FERC denied rehearing regarding the issues raised by ANR.  *ANR Storage Co.*, 155 FERC ¶ 61,279 (2016) ("Rehearing Order") (JA ___).  The Commission Orders are final orders.  ANR timely petitioned for review of both orders in this Court on August 11, 2016.  Section 19(b) of the NGA, 15 U.S.C. § 717r(b) (2012), provides that a party aggrieved by a Commission order may seek judicial review in this court.  ANR was the applicant, a party to the proceeding below, timely filed rehearing, and is aggrieved by the final orders as described *infra* at pp. 7-15.  Accordingly, this Court has jurisdiction to resolve the issues presented herein.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument has not yet been scheduled in this case.  ANR respectfully requests the opportunity to present oral argument.  As detailed below, denial of ANR's Petition was a departure from prior Commission precedent, but FERC failed to acknowledge such departure and provide a reasoned explanation for doing so.  FERC's orders are also internally inconsistent.  The orders admit that ANR met its burden of proof to include intrastate storage service in the product market and that particular storage service providers were good alternatives to ANR's services.  The Commission acknowledged its long history of finding that intrastate storage service affects demand and supply for interstate storage service, which includes ANR's services.     Yet, the Commission seeks to trump these acknowledgements by stating in the case under review that such effects are merely theoretical.   ANR provided substantial evidence showing that state-regulated storage capacity competitively impacts interstate storage services, and the speed at which the former can convert to the latter.  The Commission arbitrarily and capriciously ignored such evidence.  In addition, FERC abused its discretion and failed to engage in reasoned decision-making when it determined that ANR's market metrics (described *infra*) raised concerns that ANR could exercise market power.  FERC's orders failed to rely on substantial evidence and were contrary to

2

the evidence in the record.  Petitioner believes oral argument would assist the Court in resolving the issues presented on appeal.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Statutory Addendum attached hereto.

## STATEMENT OF ISSUES

1.     Whether FERC acted arbitrarily and capriciously, in an unduly discriminatory manner, abused its discretion, acted inconsistent with applicable legal precedent, failed to engage in reasoned decision-making, or failed to base its decision upon substantial evidence in the record:

   a.     by finding that ANR failed to meet its evidentiary burden to show that ANR lacked significant market power in the relevant markets based upon:

   i.     ANR's status as an incumbent rather than a new entrant;

   ii.     ANR's size in relation to the market;

   iii.     the alleged relative lack of competitors currently providing firm interstate storage service; and

   iv.     the alleged need for a substantial number of other facilities among the good alternatives to shift operations without any delay in order to offer firm interstate service; and

   b.     by finding that ANR failed to meet its burden to demonstrate that:

   i.     non-FERC regulated storage capacity is a good alternative to ANR's service;

5

      ii.     Dominion Transmission ("Dominion") and NiSource, Inc.'s ("NiSource") storage facilities are good alternatives to be included in the calculation of the market metrics; and

      iii.    Eaton Rapids Gas Storage's ("Eaton Rapids") working gas capacity should be divided between TransCanada and a local distribution company ("Distributor") for purposes of calculating the market metrics; and

c.    when calculating the market metrics for the relevant market;

d.    by failing to update the market metrics;

e.    by concluding that the other factors presented by ANR did not demonstrate that ANR lacks market power; and

f.    by failing to give substantive consideration of ANR's proposed mitigation, and approving market based rates for ANR based on that mitigation.

## STATEMENT OF CASE AND FACTS

On March 6, 2012, ANR petitioned for authority to charge market-based rates, rather than cost-based rates, for natural gas storage services. Petition (JA ___). Consistent with Commission policy, ANR was required to demonstrate it "lack[ed] significant market power or [] adopted conditions that significantly mitigate market power" for market-based rate authorization.[1]

FERC analyzes whether an applicant has market power in three steps. First, it defines the relevant product and geographic markets. Opinion 538 at P 58 (JA ___). The relevant product market is composed of "the applicant's service, together with other services that are good alternatives." *Id.* at P 58 (JA ___). Each proposed substitute service must be "an adequate substitute to the applicant's service in terms of quality, price and availability." *Id.* at P 60 (JA ___). "In general, the relevant geographic market is the geographic area containing those suppliers that can affect any attempt by the applicant to exercise market power." Order 678, FERC Stats. & Regs. ¶ 31,220 at P 61.

---

[1]    *ANR Storage Co.*, 141 FERC ¶ 61,099, at P 5 (2012) (citing *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines and Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076 ("*Policy Statement*"), *reh'g denied*, 75 FERC ¶ 61,024 (1996); Order 678, FERC Stats. & Regs. ¶ 31,220 ("Order 678"), *order on reh'g*, Order 678-A, 117 FERC ¶ 61,190 (2006) ("Order 678-A")) (JA ___).

7

Second, using relevant markets from step one, FERC measures the applicant's share of the market ("share") and overall market concentration (using the Herfindahl-Hirschman Index ("HHI") test). Opinion 538 at P 166 (JA ___). When calculating the relevant market metrics, the applicant's storage capacity is combined with storage capacity of its affiliates. *Id.* at P 193 (JA ___).

Finally, FERC evaluates other relevant factors regarding whether the applicant can exercise market power. *Id.* at P 58 (JA ___). Even when the application warrants closer scrutiny, the Commission considers proposed mitigation and other factors that could justify market based rates. *See ANR Storage Co.*, 141 FERC ¶ 61,099 at P 5 (2012) (JA ___).

FERC ordered a hearing on ANR's Petition, *id.*, which took place August 29-September 5, 2013. An Initial Decision was issued January 29, 2014, *ANR Storage Co.*, 146 FERC ¶ 63,007 (2014), to which ANR timely excepted.

The Initial Decision was reviewed in Opinion 538, which denied ANR's Petition. In the first market power analysis step (*i.e.*, defining the relevant markets), FERC found that (1) the geographic market consisted of Michigan, Illinois, Indiana, Ohio, and western Ontario (the "Market") and (2) the relevant product market included ANR's services, local natural gas production, other federally-regulated storage services, as well as "intrastate" storage regulated by

8

state agencies (*i.e.*, lacking authorization to furnish service in interstate commerce, either under a service-specific authorization pursuant to NGA Section 7 or on a generic "blanket" basis under Part 284 of the Commission's regulations ("Part 284")). Opinion 538 at PP 108, 110, 139 (JA ___). FERC held that "intrastate storage service should not be excluded from the market power analysis based solely on the facility not possessing a Part 284 certification." *Id.* at P 163 (JA ___).

Opinion 538 then calculated ANR's "share as 16.12 percent of working gas and 15.16 percent of daily deliverability. The HHI calculations for working gas and daily deliverability are 951 and 1,010, respectively." *Id.* at P 213 (JA ___). FERC found that ANR's share of 16.12 percent for working gas "requires closer scrutiny." *Id.* at P 215 (JA ___). FERC concluded that ANR had not shown it lacks significant market power in the relevant markets

> [b]ased on the size of the applicant in relation to the market, the relative lack of current competitors providing firm interstate storage service, the need for a substantial number of other facilities among the good alternatives to shift operations in order to offer firm interstate service, and also considering the fact that ANRS is not a new entrant but a strong incumbent . . . [*Id.* at P 220 (JA ___)].

FERC further concluded that "none of the other factors outweigh the results of the market analysis." *Id.* at P 242 (JA ___).

9

ANR timely requested rehearing of Opinion 538, which FERC denied. Rehearing Order at P 1 (JA ___).  On rehearing, FERC excluded capacity owned by Dominion and NiSource from the market metrics.  The Commission also increased capacity it attributed to ANR for a jointly owned facility when calculating such metrics.  *Id.* at PP 30-32 (JA ___).  FERC explained that such changes would "not alter the Commission's reasoning for denial" of ANR's Petition. *Id.*

## SUMMARY OF ARGUMENT

ANR's Petition should have been granted, consistent with Commission precedent.  ANR's showing satisfied the metrics and analysis the Commission has repeatedly held entitle applicants to market based rate authority.  ANR presented hundreds of pages of evidence demonstrating products and services identified in ANR's Petition, including intrastate storage services, were properly included in the Market.

For much of Opinion 538, the Commission seemed to agree.  Opinion 538 began by explaining why intrastate storage should be included in the relevant product market and detailing its findings that most of the particular intrastate storage service providers included in ANR's market definition were good alternatives to ANR's service.  Opinion 538 at PP 106-108, 162-63, 186, 188-89, 191-92, 196-97, 201-05, 208, 210 (JA ___).  Opinion 538 explained "it is not necessary that an intra-state storage provider currently possess the authority to provide interstate service in order for intra-state storage service to be included in the relevant product market."  *Id.* at P 106 (JA ___).  "[W]hile distinctions between intrastate and interstate natural gas markets may be meaningful from a legal perspective, they are not meaningful from the perspective of market price formation."  *Id.* at P 108 (JA ___) (emphasis added).  The Commission also found that evidence "demonstrated that intrastate storage that had been committed could

11

be released, sublet, assigned or otherwise used to serve a different entity. . . .
Facilities can seek Part 284 certification soon enough to potentially discipline any
attempt by ANRS to raise prices above competitive levels." *Id.* at P 162-63 (JA
___). The Commission calculated resulting HHI levels of approximately 1,000 and
an ANR market share percentage of approximately 16%. *Id.* at P 213 (JA ___).

Based on the Commission's calculation of the market metrics, ANR's
Petition should have been granted, consistent with the arguments of ANR and
Commission Trial Staff. Copious Commission precedent is clear that a market
share of 16% and an HHI level of approximately 1,000 do not raise market power
concerns. *See* Section B.1, *infra*. The Commission has characterized shares of the
market ranging from 15-17% as "relatively small" and demonstrating a lack of
significant market power. *See* pp. 24-25*, infra*. The Commission has never
applied closer scrutiny in such circumstances.

Yet, following its detailed analysis, Opinion 538 abruptly changed course.
Opinion 538 asserted that a 16% market share required closer scrutiny, citing three
cases that failed to support its position. Contradicting its extensive foundational
analysis, years of Commission precedent and specific findings as to particular
individual storage facilities, FERC stated that the intrastate storage services and
subscribed capacity were only "theoretically a good alternative . . . ." Opinion 538

12

at P 219 (JA ___).  Further, Opinion 538 imposed a number of new evidentiary burdens on ANR seemingly to block authorization of market based rates; the Commission did not acknowledge that such burdens were contrary to existing precedent or explain their abrupt appearance.

The Rehearing Order continued this internally inconsistent dialogue.  At first, the Commission explained that it "has long held that potential suppliers of one product that could enter the market of the applicant's product within a relatively short time may be included in the market power analysis.  The inclusion of intrastate storage in the product market is consistent with this longstanding Commission policy . . ."  Rehearing Order at P 22 (JA ___).  The Commission acknowledged that ANR "met its evidentiary burden to show that sufficient subscribed capacity was subject to capacity release or re-assignment to include fully subscribed storage providers as competitive alternatives."  *Id.* at P 29 (JA ___).  The Commission admitted that ANR had "established that intrastate storage providers could shift production to interstate storage within" "a relatively short time" allowing inclusion of intrastate storage capacity in the market.  *Id.* at P 22 and n.63 (JA ___).

However, just as in Opinion 538, the Rehearing Order abruptly changed course and imposed new standards contrary to existing precedent and substantial

13

record evidence, concluding that ANR "failed to demonstrate that sufficient capacity would become available to discipline a potential anticompetitive price increase by [ANR] if granted market-based rate authority." *Id.* at P 37 (JA ___). The Rehearing Order also asserted (for the first time) that ANR had failed to present evidence of the cost of physically connecting Dominion and NiSource intrastate storage facilities, thus excluding such capacity from the market metrics. *Id.* at P 30 (JA ___).

The Commission Orders should be reversed, as detailed below. They are internally inconsistent and conflict with Commission precedent. Further, ANR provided substantial evidence that state-regulated storage is more than theoretically available in the market. The Commission Orders acknowledge that intrastate storage capacity affects the demand for and price of interstate storage, but failed to adequately reflect that recognition in their holdings. The Commission Orders are arbitrary, capricious, an abuse of discretion, a departure from prior precedent without acknowledgement or reasoned explanation, not supported by substantial evidence and do not constitute reasoned decision-making.

## STANDING

Parties aggrieved by a FERC order may seek judicial review.  15 U.S.C. § 717r(b).  A party is aggrieved "if it can establish both the constitutional and prudential requirements for standing."  *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009) (citation omitted).  Constitutional standing requires (i) injury-in-fact; (ii) causation; and (iii) redressibility.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).  The injury-in-fact requirement includes "not only present and immediate harm, but also a 'looming unavoidable threat' of harm.  In other words, it is sufficient for standing purposes if a party has an 'immediate prospect of future injury.' "  *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 516 (D.C. Cir. 1985) (citations omitted).  For example, in *ANR Pipeline*, this Court held that the petitioner suffered an injury requisite to attain standing as a result of an order that approved a new rate methodology but did not implement a new rate pursuant to that methodology.  *Id.* at 515-16.

ANR petitioned for authorization to charge market-based rates for natural gas storage service and was a party to the proceeding before FERC.  ANR is injured by FERC's orders because FERC denied ANR's petition for market-based rate authority.  Therefore, ANR is precluded from implementing market-based rates, resulting in economic harm to ANR.  ANR thus has standing to challenge the Commission Orders.

15

# ARGUMENT

## A.    Standard of Review

Under the Administrative Procedure Act, FERC's orders fail if they are "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), 706(2)(D) (2012); *see also* 15 U.S.C. § 717r (requiring orders to be supported by substantial evidence). An agency violates those requirements if it fails to articulate " 'a rational connection between the facts found and the choice made,' " *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 639 (D.C. Cir. 2010) (citation omitted); fails "to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); "ignores important arguments or evidence," *Natural Res. Def. Council v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987); *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Unless [FERC] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned."); or offers " 'an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *AT&T Corp. v. FCC*, 236 F.3d 729, 734 (D.C. Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 (1983)). FERC also "must be able to demonstrate that it

16

has made a reasoned decision based upon substantial evidence in the record." *Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1115 (D.C. Cir. 2002) (citation omitted).

Moreover, while FERC may "depart from a prior policy or line of precedent, . . . it must acknowledge that it is doing so and provide a reasoned explanation." *Louisiana Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1303 (D.C. Cir. 2014) (citations omitted). "[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) (citations omitted). "[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute." *W & M Properties of Conn., Inc. v. N.L.R.B.*, 514 F.3d 1341, 1347 (D.C. Cir. 2008). Furthermore, when determining whether FERC has provided a "reasoned explanation" for departing from precedent or policy, the court "looks only to the reasons given by the agency." *Id.* (citation omitted).

The Commission Orders are arbitrary, capricious, an abuse of discretion, a departure from prior precedent without acknowledgement or a reasoned explanation, not supported by substantial evidence and do not constitute reasoned decision-making.

17

**B.    FERC erred by finding that ANR failed to show that it lacked significant market power**

Calculating ANR's market share as 16.12%, FERC applied "closer scrutiny"

(Opinion 538 at P 215 (JA ___)) to deny ANR's Petition

> [b]ased on the size of the applicant in relation to the market, the relative lack of current competitors providing firm interstate storage service, the need for a substantial number of other facilities among the good alternatives to shift operations in order to offer firm interstate service, and also considering the fact that [ANR] is not a new entrant but a strong incumbent . . . [*Id.* at P 220 (JA ___).]

FERC's denial was erroneous.

**1.    FERC erred in concluding that ANR's share, combined with its status as an incumbent storage provider, precluded ANR from receiving market-based rate authority**

FERC concluded that ANR's 16.12% share level required closer scrutiny

and that ANR's incumbent status suggested it might not "lack[ ] significant market

power in the relevant markets."    Opinion 538 at P 220 (JA ___).    FERC's

conclusion relied solely on three cases: (1) *Wyckoff Gas Storage Co.*, 105 FERC ¶

61,027 (2003), (2) *Copiah Storage, LLC*, 121 FERC ¶ 61,272 (2007), *reh'g*

*granted on other grounds*, 123 FERC ¶ 61,082 (2008), and (3) *Red Lake Gas*

*Storage, LP*, 102 FERC ¶ 61,077, *reh'g denied*, 103 FERC ¶ 61,277 (2003).

Opinion 538 at PP 215-19 (JA ___).    ANR's Rehearing Request explained that

when an applicant has a share of 16.12 percent or less in a market with low HHI

18

levels FERC has never (1) rejected market based rates for the applicant or (2) applied "closer scrutiny." Rehearing Request at pp. 16-24 (JA ___). Ignoring ANR's argument, and *Wyckoff, Copiah* and *Red Lake* cases, the Rehearing Order asserted that Opinion 538 "addressed the specific concerns of this case in relation to prior cases involving similar market metrics." Rehearing Order at P 38 (citing Opinion 538 at PP 215-220)) (JA ___). Further, FERC stated that even if ANR's share had been 14.92% that would not alter its rulings. Rehearing Order at P 33 (JA ___).

Opinion 538 did not cite to any precedent on this point other than *Wyckoff*, *Copiah*, and *Red Lake*. Additional citations were missing because there is no precedent for FERC applying closer scrutiny in such circumstances. The three cases that Opinion 538 cited to support its position do nothing of the kind -- instead, they demonstrate that a share of 14.92% or 16.12% does not require closer scrutiny.

Opinion 538 cited *Wyckoff* to justify closer scrutiny. Opinion 538 asserted that in *Wyckoff* FERC approved market based rates for the applicant, despite the applicant's 16% market share, because after applying closer scrutiny FERC found that the applicant "was a new entrant into a market facing an incumbent with a 42 percent share charging cost-based rates." Opinion 538 at P 215 (JA ___). FERC's

reliance upon *Wyckoff* is incorrect; FERC did not apply closer scrutiny because Wyckoff had a 16% share.

In *Wyckoff*, FERC applied closer scrutiny because the HHI levels in Wyckoff's market exceeded 1,800 (*i.e.*, 2,267 for daily deliverability and 2,382 for working gas (in contrast to this case)). *See Wyckoff*, 105 FERC ¶ 61,027 at PP 48 and 60. Wyckoff admitted that those HHI levels demonstrated "a concentrated market." *Wyckoff*, 105 FERC ¶ 61,027 at P 48. As FERC noted in Opinion 538 and *Wyckoff*, FERC applies "closer scrutiny if the applicant's HHIs were above 1800." Opinion 538 at P 214 (noting ANR's HHI levels were significantly below 1,800) (JA ___); *Wyckoff*, 105 FERC ¶ 61,027 at n.20. The high concentration levels in *Wyckoff* reflected another entity's 42 - 43 percent shares in daily deliverability, and working gas, capacities, which were subject to cost based rates. *Id.* at PP 47-48. Notably, FERC characterized Wyckoff (with a 16% share) as "relatively small" (*id.* at PP 47-48), and found that its "share does not indicate a reasonable likelihood that [the applicant] will hold market power" (*id.* at P 59); yet Opinion 538 claims a 16% share requires closer scrutiny.

Opinion 538's characterization of *Wyckoff* is clearly incorrect and conflicts with prior Commission characterizations of the case. FERC has cited *Wyckoff* repeatedly for the proposition that applicants with "relatively small" shares but

20

operating in markets with *high HHIs (i.e., high market concentration)* may not be able to exercise market power in a market with another participant that holds a 40 percent share and charges cost based rates. *Rager Mountain Storage Co.*, 152 FERC ¶ 61,098, at PP 12-14 (2015) (HHI levels above 1,800 driven by the presence of a single large storage provider; most storage services in that market were provided at cost based rates); *UGI Storage Co.*, 133 FERC ¶ 61,073, at PP 98-100 (2010), *reh'g denied*, 134 FERC ¶ 61,239 (2011); *Chestnut Ridge Storage LLC*, 128 FERC ¶ 61,210, at PP 35-39 (2009), *vacated on other grounds by* 139 FERC ¶ 61,149 (2012); *UGI LNG, Inc.*, 127 FERC ¶ 61,257, at PP 18-20 (2009); *Arlington Storage Co.*, 125 FERC ¶ 61,306, at PP 53-54 (2008); *Cent. New York Oil & Gas Co.*, 116 FERC ¶ 61,277, at PP 33-34 (2006).

Thus, Opinion 538's interpretation of *Wyckoff* departs from the Commission's prior interpretation, and is not supported by *Wyckoff* itself. While *Wyckoff* decided that a 16 percent share of a "concentrated market" with HHIs exceeding 2,200 did not result in *less scrutiny* than usual, Opinion 538 transformed *Wyckoff* into a decision that stands for the proposition that a 16 percent share in a market with "low HHI" values "requires closer scrutiny." *If a 16% share did not indicate market power in the Wyckoff market with a HHI level of over 1,800, then it cannot indicate market power in ANR's market with HHI levels of approximately 1,000.* FERC has previously explained that a large share is "generally a necessary

21

condition for the exercise of market power," although even a large share may not be determinative "if entry into the market is easy or there are other competitive forces at work." *Policy Statement*, 74 FERC ¶ 61,076 at 61,234. Without precedent or explanation, Opinion 538 fundamentally deviated from this prior analysis.

Opinion 538 also cited *Copiah* to support its conclusion that a 16.12% share "requires closer scrutiny." Opinion 538 at PP 216-17 (JA ___). Yet Copiah's 22% share significantly exceeds ANR's share, Opinion 538 at P 217 (JA ___), and unlike a 16% market share, would ordinarily raise a market power concern. *Copiah*, 121 FERC ¶ 61,272 at P 24. *Copiah* only examined whether there were factors mitigating against the exercise of market power after concluding that the applicant's share was elevated. Further, Copiah was not a "new entrant[] to competitive markets" as suggested by Opinion 538 (at PP 216-17 JA ___). Copiah was owned and operated by incumbent energy company Spectra Energy Transmission and its predecessor Duke Energy Gas Transmission Corp., owners of interstate facilities. *Copiah*, 121 FERC ¶ 61,272 at n.1.

Finally, Opinion 538 cited *Red Lake* to support its position that a 14.92% or 16.12% share required closer scrutiny. Opinion 538 at PP 215, 218-19 (JA ___). *Red Lake's* applicant had HHIs as high as 8,167 and an approximately 20 percent

share (*Red Lake*, 102 FERC ¶ 61,077 at P 32), in contrast to ANR's HHIs and shares, which were no higher than 1,010 and 16.12 percent, respectively. Opinion 538 at P 213. (JA ___). *Red Lake* found the "applicant's share is too high in a highly concentrated market for FERC to be confident that the applicant lacks significant market power." *Red Lake*, 102 FERC ¶ 61,077 at P 32.

Thus the Commission Orders provided no cognizable support for the claim that shares of 14.92% or 16.12% required closer scrutiny. In fact, ANR's share falls well below the shares of other companies authorized to charge market based rates. In *ONEOK Gas Storage, L.L.C.*, 90 FERC ¶ 61,283, at 61,955 (2000), an incumbent intrastate pipeline and storage operator with a 21.8 percent share for daily deliverability received market based rate authority, despite its affiliation with other owners of interstate natural gas assets. *Id.* at 61,955 (failing to discuss ONEOK's incumbency or its effect on market based rate authority). The Commission's Orders did not discuss why ONEOK's incumbency was a non-factor.

In *Petal Gas Storage, L.L.C.*, 102 FERC ¶ 61,243 at n.11 & P 22 (2003), FERC found that an applicant with a 16.9 percent share of working gas and a 20.6 percent share of daily deliverability *lacked* "significant market power in the relevant market" even though the applicant was not a new entrant but was

23

previously owned by an incumbent natural gas industry participant (Chevron U.S.A., Inc.) that had leased affiliated storage capacity a decade before. *See Petal Gas Storage Co.*, 66 FERC ¶ 61,339, at 62,121 (1994). At the time of *Petal*, the applicant was owned by an incumbent, El Paso Energy Partners, LP. *Petal*, 102 FERC ¶ 61,243 at P 3. *See Petal Gas Storage, LLC*, 97 FERC ¶ 61,097 at 61,520-21 (2001) (17.6 percent share of daily deliverability), *reh'g granted on other grounds*, 106 FERC ¶ 61,325 (2004), *vacated on other grounds by Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695 (D.C. Cir. 2007).

FERC has also found that a "relatively small" 15 percent share indicated there are "alternative storage services sufficient to compel [the applicant] … to charge a competitive rate to attract customers, thereby preventing it from exercising monopoly power in the relevant market area." *Egan Hub Partners, L.P.*, 95 FERC ¶ 61,395, at 62,472-73 (2001) (19.3 percent share of incoming hub capacity), *amended by*, 99 FERC ¶ 61,269 (2002). *Egan's* applicant had been providing interstate service from Commission-jurisdictional pipeline facilities for years (*see Egan Hub Partners, LP*, 72 FERC ¶ 61,225 at 62,040 (1995)), yet was granted market based rates.

According to FERC, a 16 percent share is "relatively small," even though it represented the highest share of total deliverability in the market. *Liberty Gas*

24

*Storage, LLC*, 127 FERC ¶ 61,221, at P 28 (2009).  Like the foregoing cases, FERC's finding was not based upon the applicant's status as a new entrant.  Prior to *Liberty*, the applicant provided interstate service.  *See id.* at P 4.  The applicant was a wholly-owned indirect subsidiary of Sempra Energy International and Proliance Energy, LLC.  *See id.* at P 3.  Therefore, the applicant was an incumbent and the largest storage provider in the market, yet Liberty was authorized to charge market based rates.

In ANR's Market, FERC authorized market based rates for affiliates of DTE Energy Company ("Detroit"),[2] that originally held shares of approximately 18 percent and 17 percent for working gas and daily deliverability, respectively.[3] FERC approved their applications without "closer scrutiny" despite Detroit's status as an incumbent storage provider and the applicants' reliance upon intrastate storage capacity in their market power study that ANR also relies upon in its market power study.  *See* note 2, *supra*; Rehearing Request at pp. 20, 25 (JA ___).  In August, 2012, Detroit notified FERC that while the share held by itself and its

---

[2]  The Letter Orders cited can be found on FERC's eLibrary system: https://elibrary.ferc.gov/idmws/search/fercgensearch.asp.

*Washington 10 Corp.*, Letter Order, Docket No. PR08-26 (issued Oct. 3, 2008); *Michigan Consolidated Gas Co.*, Letter Order, Docket No. PR09-10 (issued May 21, 2009).

[3]  Rehearing Request at p. 20 (JA ___).

affiliates had grown to 19.4 percent, "close scrutiny of [its affiliates'] market power status [was] not required." Rehearing Request at p. 20 (JA ___).  FERC took no action regarding the notification.

In electric proceedings, FERC has held a 20 percent threshold triggers closer scrutiny because it "strikes the appropriate balance between having a conservative but realistic screen and imposing undue regulatory burdens."  *Analysis of Horizontal Market Power under the Federal Power Act*, 138 FERC ¶ 61,109, at P 56 (2012).  The 20 percent threshold is a conservative means "to identify those sellers that *raise no horizontal market power concerns . . .*"  *Id.* at P 6  (emphasis added).  FERC has also found that an oil pipeline with a share of 43 percent and an HHI of 2,102 lacked significant market power.  *See Buckeye Pipe Line Co.*, 53 FERC ¶ 61,473, at 62,669 (1990), *corrected by*, 54 FERC ¶ 61,117 (1991), *reh'g granted on other grounds*, 55 FERC ¶ 61,084 (1991).  FERC also has authorized market based rates for oil pipelines based on HHIs as high as 2,347 and a 25% share (*Colonial Pipeline Co.*, 92 FERC ¶ 61,144 at 61,535 (2000))  and in another case with HHIs up to 2,400 and a share of 36%.  *Williams Pipe Line Co.*, 71 FERC ¶ 61,291, at 62,138-39 (1995).

Without explanation or substantial evidence, FERC significantly departed from existing precedent showing a 14.92% or 16.12% share does not indicate

market power. Prior cases demonstrate that such shares are "relatively small" and even a 17 percent share evinced a lack of "significant market power," and therefore do not raise market power concerns. FERC here swerved from precedent but did not "acknowledge that it is doing so and provide a reasoned explanation." *Louisiana*, 772 F.3d at 1303 (citations omitted); *W&M*, 514 F.3d at 1347. Instead FERC misinterpreted three inapposite cases to justify the outcome here.

### 2. ANR demonstrated it lacks significant market power in the relevant markets based upon ANR's size in relation to the market.

FERC rejected ANR's application because, *inter alia*, of "the size of the applicant in relation to the market" and because ANR is "the largest storage provider in the market." Opinion 538 at P 219-20 (JA ___). ANR sought rehearing, pointing to existing precedent regarding an applicant's size relative to the market and noting the significance of that relationship is already taken into account in the market metrics. Rehearing Request at pp. 24-27 (JA ___). The Rehearing Order largely ignored ANR's arguments and instead offered a non-sequitur: "the statement is not *duplicative of* the market metrics; rather it is based upon the market metrics, and is a statement of fact as determined and supported by the market metrics." Rehearing Order at P 34 (JA ___).

As detailed above, FERC uses market share and concentration metrics to determine whether an applicant is likely to exercise market power. Share is an

27

indicator regarding whether an applicant "could exercise market power acting alone." *Policy Statement*, 74 FERC ¶ 61,076 at 61,234. HHI values measure "the relevant market's concentration as an indicator of the potential of an applicant to act together with other sellers to raise prices" above the level that would prevail in a competitive market. Order No. 678, FERC Stats. & Regs. ¶ 31,220 at P 51 (citation omitted). These market metrics already address whether an applicant can exercise market power due to their size in relation to the market.

According to Opinion 538, ANR's highest HHI score is 1,010, and the HHI for working gas (the component that FERC describes as problematic) is below 1,000. Opinion 538 at P 213 (JA ___). The low HHIs here indicate that customers have large quantities of good alternatives available from many independent sellers. The share and HHI quantifications are precisely quantified; they represent data-based standards long used by the Commission and applied to many other industries to assess whether markets are competitive. *Policy Statement*, 74 FERC ¶ 61,076, at 61,231; *see, e.g.*, *Mobay Storage Hub, Inc.*, 117 FERC ¶ 61,298, at P 28 (2006). The HHI data and ANR's shares clearly show that ANR's market profile should not raise market power concerns.

In contrast, the "largest" provider could have a share of 15% or 45%; it is far less precise than HHIs and share data. In *Buckeye*, an oil pipeline with the

largest market share (52%) received market based rate authorization for the relevant market (*i.e.*, Detroit). *See Buckeye Pipe Line Co., L.P.,* 50 FERC ¶ 63,011, at 65,056 (1990), *aff'd in pertinent part,* 53 FERC ¶ 61,473 at 62,670 (1990). Requiring a separate inquiry regarding ANR's relative size creates a new hurdle, effectively diminishes or trumps the market metrics FERC previously used, ignores many cases that involved the "largest" provider but did not find that status determinative or even significant, and produces a biased result at odds with substantial record evidence.

Furthermore, Opinion 538's statement (at P 217 (JA ___)) that it "is unquestioned that ANR is the largest storage provider in the market" is factually inaccurate. While ANR has the largest storage working gas capacity, ANR does *not* have the largest share of daily deliverability in the Market. Nor is it even the second largest. In fact, it ranks *third*. Ex. ANR-116 (JA ___); Rehearing Request at p. 25 (JA ___).

FERC's denial of ANR's Petition on this basis conflicts with precedent even for storage providers in ANR's geographic market. As noted above, both Detroit and ANR are incumbent storage providers, included many of the same state-regulated facilities in their market power studies, *and Detroit has a higher share of daily deliverability than ANR.* Detroit is a direct competitor with ANR. *See* Ex.

ANR-247 (Detroit's proposal to replace ANR's service to Northern States) (JA

___).   Yet, FERC authorized market based rates for Detroit's affiliated storage

facilities, while denying ANR's application.  *See* note 2, *supra*; *see also Liberty*,

127 FERC ¶ 61,221 at P 28.  It is arbitrary and capricious to permit Detroit's

affiliated storage facilities to charge market based rates while denying similarly-

situated ANR facilities the same authority.  *ANR Pipeline*, 71 F.3d 897 (requiring

reasonable justification if FERC excludes the ostensibly intrastate service provider,

furnishing interstate service, from the same standards as interstate pipelines).

Consequently, the rationale of Opinion 538, that ANR's share is sufficient

grounds to deny market based rates to an incumbent with the largest market share,

is inconsistent with Commission precedent and substantial evidence in the record,

and if maintained, would mean that other market participants' market based rate

authorizations would have to be re-opened and vacated.

> ### 3. FERC Erred by Requiring ANR to Demonstrate that There Was Not a Substantial Number of Facilities Among the Good Alternatives that Needed to Obtain a Part 284 Certificate Or Release Capacity

Opinion 538 erroneously denied ANR's Petition based on "the relative lack

of current competitors providing firm interstate storage service" and "the need for

a substantial number of other facilities among the good alternatives to shift

operations in order to offer firm interstate service," apparently without "[a]ny

delay." Opinion 538 at PP 219, 220 (JA ___). Without evidentiary support, any quantification of what "a substantial number" amounted to, and contrary to existing precedent, Opinion 538 required that ANR show there was not a "substantial" number of facilities "that would have to either (a) acquire a Part 284 certificate, and/or (b) release capacity, in order to prevent an exercise of market power by" ANR. *Id.* at P 219 (JA ___). FERC never before imposed such a requirement on an applicant with comparable market metrics. Opinion 538 broke from Commission precedent without adequate explanation. Further, Opinion 538's conclusion above was contradicted by Opinion 538's earlier findings and substantial evidence in the record.

Earlier in Opinion 538, the Commission held that "it is not necessary that an intrastate storage provider currently possess the authority to provide interstate service in order for intra-state storage service to be included in the relevant product market." *Id.* at P 106 (JA ___).

> Not only can intrastate storage providers quickly enter the interstate market upon a price increase, but use of existing intrastate storage reduces the overall demand for interstate storage and can serve to discipline an anti-competitive price increase in the interstate storage market. When a customer can turn to internal sources, such as [a Distributor] turning to its own storage facilities, those facilities should be included in the relevant product market because they reduce demand for the product offered in the interstate market. Both the

31

> intrastate and interstate markets are inter-related.  As the
> Commission has held, while *distinctions between*
> *intrastate and interstate natural gas markets* may be
> meaningful from a legal perspective, they *are not*
> *meaningful from the perspective of market price*
> *formation*.    Purchasers of natural gas in interstate
> commerce draw on the same sources of supply as users
> and purchasers of intrastate natural gas. . . .[I]ntrastate
> storage should be included in the relevant product
> market.   [*Id.* at P 108 (citations omitted) (emphasis
> added) (JA ___).]

When discussing whether subscribed capacity was available, the

Commission also held that ANR "demonstrated that intrastate storage that had

been committed could be released, sublet, assigned or otherwise used to serve a

different entity."  *Id.* at P 162 (JA ___).  FERC reversed the Initial Decision's

> exclusion of facilities based solely on the absence of
> Part 284 certification.   As discussed *supra*, intrastate
> storage service should not be excluded from the market
> power analysis based solely on the facility not possessing
> a Part 284 certification.  The criterion for determining a
> good alternative is that it be available soon enough, not
> that it be available immediately.  Facilities can seek Part
> 284 certification soon enough to potentially discipline
> any attempt by ANRS to raise prices above competitive
> levels.  [*Id.* at P 163 (JA ___).]

FERC found that "the Initial Decision improperly excluded a number of good

alternatives, including intrastate alternatives and alternatives subject to capacity

release, on the mistaken premise that these alternatives were never available, or

otherwise were not in the relevant markets."  *Id.* at P 183 (JA ___).  FERC then

included intrastate facilities in its market metric calculations for ANR, in each such

32

case holding that the current absence of a Part 284 certificate does not eliminate intrastate capacity from the list of good alternatives to ANR and that intrastate capacity affects demand, and price, for interstate service. *Id.* at PP 186, 188-89, 191-92, 196-97, 201-05, 208, 210 (JA ___).

Yet despite precedent, its previous findings and analysis, and substantial record evidence, Opinion 538 abruptly changed course at paragraphs 219-220 and required ANR to establish that less than a substantial number of storage providers in the market did not have Part 284 authorization.

FERC denied ANR's Rehearing Request, erroneously concluding that ANR "failed to demonstrate that sufficient capacity would become available to discipline a potential anticompetitive price increase by [ANR] if granted market-based rate authority." Rehearing Order at P 37 (JA ___). The Commission required ANR to show:

> the existence of intrastate storage and fully subscribed interstate capacity subject to release, in itself, provided a sufficient check on a potential anti-competitive price increase by [ANR] if it were granted market-based rate authority. Such a check would require [an] additional supply of interstate firm storage, either through actual capacity release or through intrastate storage providers entering the interstate market. [*Id.* at P 37 (JA ___).]

Like Opinion 538, the Rehearing Order was internally inconsistent. Earlier in its analysis, FERC stated that ANR "met its evidentiary burden to show that

33

sufficient subscribed capacity was subject to capacity release or re-assignment to include fully subscribed storage providers as competitive alternatives." *Id.* at P 29 (JA ___). Further the Commission explained that:

> If production substitution between a group of products is nearly universal . . . then those products can be included in the same product market. The similarity in facilities providing inter- and intra-state storage service meets this exception. . . . The Commission has long held that potential suppliers of one product that could enter the market of the applicant's product within a relatively short time may be included in the market power analysis. The inclusion of intrastate storage in the product market is consistent with this longstanding Commission policy, as noted by [ANR] . . . [*Id.* at PP 21-22 (citations omitted) (JA ___).]

The Commission found that ANR "established that intrastate storage providers could shift production to interstate storage within" "a relatively short time," allowing inclusion of intrastate storage in the Market. *See id.* at P 22 and n.63 (JA ___).

FERC's imposition of a new evidentiary hurdle is arbitrary and capricious, not based on substantial evidence and contrary to existing precedent, and refuted by the admissions in the Commission Orders.

> ### a.    FERC Repeatedly Has Used State-Regulated Storage in Calculating an Applicant's Share Without Considering Whether There was a Substantial Amount of Such Storage

Prior to Opinion 538, the Commission never required an applicant to demonstrate that something less than a "substantial" number of intrastate storage service providers were included in the applicant's market metrics. This newly-imposed requirement conflicts with Commission precedent. Traditionally the Commission has determined whether an alternative is available "soon enough" to constrain efforts to raise prices (*Policy Statement*, 74 FERC ¶ 61,076 at 61,231), "by a significant amount for a significant period of time." *Magnum Gas Storage, LLC*, 134 FERC ¶ 61,197, at P 31 (2010), *amended by* 135 FERC ¶ 61,210 (2011). FERC's position prior to Opinion 538 was that potential entrants restrain pricing power: actual entry need not be proven. *See Leaf River Energy Center, LLC*, 142 FERC ¶ 62,233 at 64,640 (2013) (including projects in the market metrics that had been authorized but not constructed), *vacated on other grounds by* 156 FERC ¶ 61,015 (2016). Yet Opinion 538 (at P 219 (JA ___)) required market entry without "[a]ny delay."

FERC has repeatedly included state-regulated facilities as good alternatives when evaluating whether a seller has market power, without any showing that there was less than a "substantial" number of facilities that would have to get Part 284 authorization.[4] In *Orbit*, the applicant's list of good alternatives included storage

---

[4]    *See, e.g.*, *Orbit Gas Storage, Inc.*, 126 FERC ¶ 61,095 (2009), *vacated on other grounds by* 150 FERC ¶ 61,157 (2015); *Magnum*, 134 FERC ¶ 61,197; *Enstor*

35

capacity operated by intrastate pipelines, intrastate Distributors, or other entities not offering Part 284 firm storage service at the time.  *See* Ex. ANR-69 at 16-20 (JA ___).  While 10.6 percent of the capacity in *Orbit's* proposed market did *not* have a Part 284 certificate (*see* Exs. ANR-69 at 15-20 (JA ___), ANR-65, Table 4 (JA ___) (*Orbit* designated storage facilities)), FERC found that *Orbit's* "proposed market definition," "properly identifies good alternatives."  *Orbit*, 126 FERC ¶ 61,095 at P 23.  Similarly, only 12.8 percent of working gas capacity in ANR's market power study that could obtain a Part 284 certificate lacked one.  Rehearing Request at p. 30 & n.114 (JA ___).

*Bluewater*, *MichCon*, *WPS-ESI*, and *Orbit* -- all involving facilities in the Market, three of which involved facilities in Michigan -- authorized market based rates predicated on share and HHI calculations that included state agency-regulated storage capacity that Opinion 538 implies is not readily available as a good

---

*Houston Hub Storage and Transportation, LP*, 123 FERC ¶ 61,019 at P 33 (2008), *vacated on other grounds by* 143 FERC ¶ 61,236 (2013); *Gulf South Pipeline Co.*, 101 FERC ¶ 61,204 at P 41 (2002); *Cent. Oklahoma Oil and Gas Corp.*, 80 FERC ¶ 61,250, at 61,917-919 (1997); *see Wyckoff*, 105 FERC ¶ 61,027 at P 52 (relevant market analyses "did not offer any assessment of available capacity."); *see also Koch Gateway Pipeline Co.*, 66 FERC ¶ 61,385, at 62,303 (1994); *Chestnut*, 128 FERC ¶ 61,210.

alternative for ANR capacity.[5]  *See* Ex. ANR-65 at Table 4 (JA ___), included as Attachment A hereto.

Similarly, in *Gulf*, FERC found applicant's market power study was consistent with its previous guidance, the *Policy Statement*, and other precedent, concluding that the applicant "*must compete with 51 storage facilities, both interstate and intrastate*, within the relevant geographic area . . . .," without imposing the requirement that less than a "substantial" number of intrastate providers must shift operations.  *Gulf*, 101 FERC ¶ 61,204 at 61,887 (emphasis added; footnotes omitted).

The Commission Orders conflict with this precedent.  Yet, the Commission failed to provide a reasoned explanation for deviating from such precedent.  Thus the Commission Orders are arbitrary, capricious and an abuse of discretion.

> **b.     FERC Erred By Failing to Account for How State-Regulated Storage Capacity Affects Demand and Prices for Federally-Regulated Storage**

---

[5]   *Bluewater Gas Storage, LLC*, 117 FERC ¶ 61,122, at P 24 (2006), *reh'g granted on other grounds*, 117 FERC ¶ 61,351 (2006); *Michigan Consolidated Gas Co*., Letter Order, Docket No. PR09-10-000 at P 2(a-b) (issued May 21, 2009) (available at https://elibrary.ferc.gov/idmws/search/fercgensearch.asp.); *Orbit*, 126 FERC ¶ 61,095 at P 20; *WPI-ESI Gas Storage, LLC*, 108 FERC ¶ 61,061, at P 15 (2004).

Commission precedent and substantial evidence demonstrate that intrastate storage is more than "theoretically" available:  it clearly affects supply and demand in the Market (regardless of whether it holds Part 284 authorization) and can displace demand for ANR's service.  As Opinion 538 repeatedly admits, intrastate capacity affects demand, and therefore the price, for interstate storage.  *See*, *e.g.*, Opinion 538 at PP 186, 189, 191 (JA ___).

Even without a Part 284 certificate, state-regulated storage directly affects the market for storage services beyond that state's boundaries (to say nothing of the market for interstate storage located *within* the state's boundaries) through displacement, retail choice programs, and other means.  FERC's Order No. 720-A explained:

> A significant amount of natural gas flows from producing basins to interstate markets *on non-interstate pipelines*.  These scheduled flows impact supply considerations in interstate markets.  Similarly, *flows on non-interstate pipelines at the end of the delivery chain impact demand considerations in the interstate market*.  [Order No. 720-A, *Pipeline Posting Requirements under Section 23 of the Natural Gas Act*, FERC Stats. & Regs. ¶ 31,302 at P 44 (2010) (emphases added), *reversed on other grounds by Texas Pipeline Ass'n v. FERC*, 661 F.3d 258 (5th Cir. 2011).]

State regulated facilities "represent an important segment of the total supply in the market," and the record copiously demonstrates their impact on the interstate natural gas storage capacity.  Ex. ANR-153 at 38:11-12 (JA ___); *see also* Ex.

ANR-65 at 33:5-65:18 (JA ___).  The witness intervenors used in this case had

admitted that "even if all capacity were contracted and in the market rather than

held by the facility owner, it would remain available and in the market, either

through secondary markets or in the form of services offered by marketers."  Ex.

ANR-79 at 31 (JA ___).

The evidence clearly showed that intrastate storage without Part 284

authorization competes with interstate storage, serving (1) other in-state

Distributors; (2) other in-state end-users; and (3) in-state retail marketers.

Ex. ANR-185 at 63:6-9 (JA ___).

i.    *Intrastate Connectivity*

Intrastate facilities are widely interconnected; natural gas held in them is

readily transported to multiple locations across a particular state without using

federally-regulated transmission capacity.[6]  Thus gas stored in one Michigan

Distributor's state-regulated storage can serve loads on other Michigan Distributors

---

[6]  Ex. ANR-6 (JA ___) shows that state-regulated facilities are widely
interconnected.  Volumes can move from one side of Michigan to the other on
an intrastate basis without accessing interstate facilities.  Tr. 222:7-13, 224:23-
25 (JA ___).  ANR cited the example of a Distributor that interconnected to
other Distributors, and receives production in Michigan at five different points.
Tr. 225:5-18 (JA ___); *see also* Tr. 138:1-9 (JA ___).

and end-users, thereby satisfying demand otherwise served by ANR.[7]    The Commission Orders ignore interconnections among Distributor/intrastate providers (Ex. ANR-1 at 11-12 (JA ___)) and the access/acquisition of storage services by Distributors (Exs. ANR-4 at 2:25-4:2 (JA ___)).

This situation is not limited to Michigan.  Distributor Ameren Illinois does not have a Part 284 certificate, but its facilities are interconnected not only with six interstate pipelines, but also with two other Illinois Distributors.[8]    The interconnectivity of these facilities impacts demand in the Market.  Ameren Illinois has stated that "[t]he firm deliverability of the on-system storage enables [Ameren Illinois] to reduce the amount of interstate pipeline capacity required to meet peak day demand . . ."  Ex. ANR-172 at 4-5 (JA ___).  Another Illinois Distributor also attested to the interchangeability of inter- and intrastate storage.  *See* Ex. ANR-153 at 41:11-17 (JA ___).

---

[7]    Tr. 361:20-362:10 (JA ___).  *See Michigan Gas Utilities Corp*., 117 FERC ¶ 62,045, at 64,166 (2006) (the Distributor at issue "receives natural gas service from a number of companies," including, *inter alia*, Consumers Energy's intrastate pipelines and Michigan Consolidated Gas Company's intrastate pipelines).

[8]    *Central Illinois Public Service Co.*, 1999 Ill. PUC LEXIS 186, *3-4 (1999); *see also* Ex. ANR-65 at 42, Table 5 ("Ameren Illinois Gas Company") (JA ___); Tr. 223:14-19 (JA ___), 273:3-5 (JA ___).

40

To meet demand, Distributors combine intrastate and interstate storage services.  Ex. ANR-65 at 63:18-22 (JA ___).  Integrys Energy Group, Inc.'s utilities contract with intra- and interstate pipelines because "having multiple pipelines that serve our regulated natural gas service territory benefits our customers by improving reliability, providing access to a diverse supply of natural gas, *and fostering competition among these service providers* which can lead to favorable conditions when negotiating new agreements for transportation and *storage services*."  Ex. ANR-20 at 3 (emphases added) (JA ___).  Northern States also relies on both federally-regulated and state-regulated services, which it explained are "integrate[d]" "into its transportation portfolio."  Ex. ANR-226 at 2 (JA ___).  When a state-regulated location is fully supplied, flowing interstate supplies can be used for injections into non-federally regulated facilities.  Tr. 135:18-136:21 (JA ___).

ii.    *Retail Choice and Asset Management Agreements Allow Substitution of State Regulated Storage for Federally-Regulated Storage*

State programs allowing retail customers to choose their supplier, such as a marketer, of the commodity of natural gas ("Retail Choice") provide market participants, including marketers, with access to Distributor-owned storage facilities.  *See* Ex. ANR-65 at 40:17-41:14, 46:2-17, 48:8-10 (JA ___); *see*, *e.g.* *Georgia Pub. Serv. Comm'n*, 107 FERC ¶ 61,024 (2004); *National Fuel Gas*

41

*Distribution Corp.*, 86 FERC ¶ 61,179 (1999).  Intrastate storage capacity is offered to Retail Choice marketers, including affiliates of ANR customers, to market within the state and thus displace demand for service provided by interstate storage.  Ex. ANR-185 at 67:10-13 (JA ___).  ANR diagramed the linkage between the components of the natural gas market on page 39 of Exhibit No. ANR-65, as explained on page 40 (JA ___).

Retail Choice is available in large portions of the Market, including Ohio, Illinois, Michigan, and Ontario.  Ex. ANR-65 at 41:13-14 (JA ___).  For example, Ohio has a robust Retail Choice program, providing competition between FERC-regulated and state regulated storage,[9] as does Illinois.  Ex. ANR-65 at 48:16-49:13 (JA ___).  Further, Ontario offers a Retail Choice program allowing energy marketers to "sell gas to 'in-franchise' customers located in each [Distributor's] service territory *and utilize the [Distributors'] 'in-franchise' storage facilities to provide such service*."  Ex. ANR-65 at 50:4-11 (emphasis added) (JA ___).

Under asset management agreements and revised capacity release policies "a party agrees to manage gas supply and delivery arrangements, including transportation and storage capacity, for another party" that "temporarily release[d]

---

[9]    *See* Exs. ANR-65 at 47:6-12, 48:3-6, 51:7-10 (JA ___), ANR-75 at 3 (JA ___).

42

all or a portion of . . . capacity along with associated gas production and gas purchase agreements to an asset manager." *Promotion of a More Efficient Capacity Release Market*, 123 FERC ¶ 61,286, at P 110 (2008).[10]  Using such agreements, intrastate storage can operate as part of a total portfolio meeting changing demands at alternate locations.[11]  Marketers include state-regulated facilities in their portfolio of assets used to provide services for all of their customers.[12]  Further, volumes of gas can be traded or exchanged.  *E.g.*, Exs. ANR-185 at 40:4-8 (JA ___), ANR-65 at 56:10-14, 72:11-74:13 (JA ___).  State-regulated storage capacity allows marketers to direct supplies flowing that day on a pipeline to meet the requirements at alternate locations. Ex. ANR-185 at 62:3-5 (JA ___).  Conversely, when an alternate location is fully supplied, flowing supplies can be directed to state-regulated storage for injections.  Ex. ANR-185 at

---

[10]  In order to qualify, the agreement must permit the releasing shipper to call upon the replacement shipper to provide 100 percent of the daily contract demand for effectively five-twelfths of each year of the contract term.  *See* 18 C.F.R. § 284.8(h)(3).

[11]  Ex. ANR-185 at 62:8-11 (JA ___); Ex. ANR-4 at 7:22-8:3 (noting "the diverse interstate and intrastate pipelines serving the Central Great Lakes Market" which are detailed in Ex. ANR-6, pp. 2-4), 12:2-7(JA ___).

[12]  Ex. ANR-185 at 61:10-21 (JA ___); *see also* Ex. ANR-220 at 5 (BP stated that gas is "essentially not tracked from the storage facility to the customer") (JA ___).

43

**Material Under Seal Deleted**

62:5-8 (JA ___); *see* Ex. ANR-185 at 63 (diagram) (JA ___).  Thus demand for federally-regulated storage can be offset by utilizing the state-regulated storage.

*iii.*    *Intervenors and Other Distributors use Exchanges and Flowing Supplies to Substitute State Regulated Capacity for Interstate Storage Services*

State-regulated storage can substitute for interstate storage using exchanges. Historically, ANR's facilities have been used in exchange arrangements that allow customers to swap gas while avoiding physically transporting the gas over the distance between points at which gas is exchanged, for instance to Ohio.[13]  The deliveries are analogous to marketers/aggregators' swaps and exchanges.  *See* Ex. ANR-185 at 47:3-13 (JA ___).

The record also reveals extensive transactions by ANR's customers within areas (such as Ohio) and on state-regulated facilities that the Commission presumes are not readily available.

**Material Under Seal Deleted**

---

[13]    *ANR Storage Co.*, 8 FERC ¶ 61,059, at 61,198-99 (1979).  *See* Ex. ANR-185 at 46:11-47:2 (JA ___).

44

**Material Under Seal Deleted**

These exchanges occur at points of interconnection with the owners of extensive intrastate storage capacity, indicating that intrastate storage is a good substitute for ANR's services. This evidence also demonstrates that exchanges replicate the firm storage services provided by ANR and are occurring or otherwise available in the market.

Marketers and flowing supplies provide the same flexibility to customers that is offered by storage. For example, Northern States meets peak design day needs using marketers and flowing supplies. Ex. ANR-65 at 67:13-25 (citing Ex. ANR-73 at 19:12-18) (JA ___) (Northern States combines short term firm purchases with supply delivered directly at its city gate and peak shaving facilitates to meet its needs). Northern States also uses gas marketers like BP Canada Energy

45

Marketing Corporation ("BP Canada") as a source of firm gas supplies.  Ex. ANR-73 at 35 (JA ___).  Like Tenaska, BP Canada uses its portfolio of contracts to serve its customers.  *See* p. 47, *infra*.

In addition, a number of actively traded pools are located close to ANR, including the Chicago city gate, ANR Joliet Hub, Alliance Hub, Dawn Hub, Lebanon Hub, and MichCon's and Consumer's city gates.  Ex. ANR-153 at 40:6-8 (JA ___); Ex. ANR-4 at 3:3-4:2 (JA ___).  Trading hubs integrate exchange and flow of gas between "(1) intrastate pipelines and intrastate storage facilities and (2) interstate pipelines and interstate storage facilities."  Ex. ANR-153 at 40:9-11 (JA ____).  Through these pools, marketers and Distributors access "highly competitive and robust natural gas commodity markets."  Ex. ANR-153 at 40:11-14 (JA ___).

Intervenor Tenaska's affiliate (a marketer) has stated that "[w]hether or not a particular Dth has been sold upstream by an interstate pipeline, intrastate pipeline, [Distributor] or end-user is a question that, in most circumstances, cannot be answered."  Ex. ANR-208 at 2 (JA ___).  It noted that it "does not source gas and thus, cannot specify the customers serviced by gas from such [specific] storage facilities" and that it "does not know whether such gas was previously stored in a facility not providing service pursuant to the NGA Section 7(c) authorization."  Ex.

46

**Material Under Seal Deleted**

ANR-220 at 3-4 (JA ___).  *See* Ex. ANR-231 at 14 (marketing material of Tenaska's affiliate that states that it relies on a large network of pipelines and storage facilities, that included intrastate facilities to serve its customers) (JA ___). Tenaska's affiliate does not reserve specific capacity for individual customers nor does it "earmark ANR Pipeline or [ANR] for individual customers.  Rather, *we use this storage in our portfolio of Michigan storage to serve our customers in the Midwest.*"  Ex. ANR-220 at 1-2 (emphasis added) (JA ___).

Similarly, BP Canada could not identify "each party that has purchased the gas BP Canada caused to be stored in" ANR's facilities, Ex. ANR-220 at 5 (JA ___), because:  "[t]he pooling of citygate markets that are served with multiple sources of supply and comingling of gas receipts on the transportation agreements that get delivered into these pools or into other downstream transportation agreements makes this essentially impossible, and could not be accurately audited."  Ex. ANR-66 at 1-2 (JA ___).

**Material Under Seal Deleted**

Exhibits S-33 through 35 (JA ___) depict numerous receipt/delivery points at which ANR customers trade or receive natural gas from a supplier or storage provider within the Market. *See* Attachment B hereto. The map demonstrates the integration of the Market and the use by two key marketers, that intervened in this case, of many sources aside from ANR to supply their customers.

Similarly, Northern States asserted that it "does not know if the gas it purchases has been stored or comes directly from a production facility." Ex. ANR-66 at 22 (JA ___). An affiliate of ANR's competitor Detroit also told FERC that:

> gas may or may not have been sold by a pipeline, [Distributors], or one of their affiliates before it reaches the burner tip. Tracking such sales in a lengthy chain is difficult, if not impossible, given that gas is a fungible product, and a substantial portion of transportation is achieved through displacement. [Ex. ANR-91 at 2-3 (JA ___).]

The holding of the Commission Orders ignored this evidence. Instead, in a conclusory sentence, Opinion 538 stated that it was only theoretical that intrastate storage is a good alternative to ANR. Opinion 538 at P 219 (JA ___). As shown above, intrastate storage competes with and affects demand for and prices of ANR service, in fact, not "theoretically," despite not currently holding Part 284 authorization. Thus, the Commission Orders are arbitrary and capricious and contrary to substantial evidence.

48

c.    **FERC Erred By Failing to Consider Circumstances Related to Michigan State-Regulated Storage Capacity and Canadian Storage Capacity**

Opinion 538 ignored the direct impact that storage in Canada, or in Michigan but that serves Canada, has on the Market.  ANR sought rehearing of Opinion 538 on that basis.  Rehearing Request at pp. 49-52 (JA ___).  The Rehearing Order failed to address ANR's arguments.

Obviously, storage capacity in Ontario, Canada does not need Part 284 authorization, any more than storage capacity in Michigan needs authorization from Canada's National Energy Board.  "Any market participants with a [NGA] Section 3 authorization to import and export to Canada can get gas out of state [*i.e.*, Michigan]."  Tr. 272:23-273:1, 273:8-15 (JA ___).  Gas flows through Michigan and Ontario are highly integrated, and multiple entities possess the authority to export and import natural gas to and from Canada.[14]  Interconnected

---

[14]    *See*, *e.g*., Ex,. ANR-8 (providing an index of ANR customers and the firm contracts held by each customer) (JA ___), ANR-14 (reflecting that customers of ANR, and affiliates of such customers, all take storage service in Ontario) (JA ___).  Tr. 273:16-274:7 (JA ___); Ex. ANR-65 at 42-44 (regarding "Consumers Energy Company" and "Michigan Gas Utilities Corp.") (JA ___).  *See SEMCO Energy, Inc*., DOE/FE Order No. 3142, FE Docket No. 12-95-NG (issued Sept. 18, 2012); *DTE Gas Co*., DOE/FE Order No. 3228, FE Docket No. 12-175-NG (issued Feb. 12, 2013); *DTE Energy Trading, Inc*., DOE/FE Order No. 3029, FE Docket No. 11-129-NG (issued Nov. 4, 2011); *Shell Energy North America (US), L.P*., DOE Order No. 3086, FE Docket No. 12-25-NG (issued Apr. 23, 2012); *see Union Gas Ltd*., DOE/FE Order No. 3111,

**Material Under Seal Deleted**

Michigan Distributors can export supplies to Canada and directly compete with ANR even from capacity not subject to Part 284 authorization. Tr. 224:19-225:18 (JA \_\_\_). As Ex. ANR-6 at pp. 2-4 (JA \_\_\_) shows, Distributor MichCon's facilities extend from the southern side of the Straits of Mackinaw to the international border at Ontario near St. Clair Michigan. Affiliates of current and former ANR customers engaged in Canadian transactions take intrastate service on MichCon. Ex. ANR-65 at 56:3-7 (JA \_\_\_). Similarly, facilities of Distributor Consumer's Energy cover much of the state and extend to the U.S. - Canada border at St. Clair.

**Material Under Seal Deleted**

The Commission Orders failed to analyze this evidence and therefore are arbitrary and capricious and not based on substantial evidence.

---

FE Docket No. 12-52-NG (issued June 22, 2012). The DOE/FE orders are available at https://energy.gov/fe/downloads/electronic-docket-room-e-docket-room.

### d. State-Regulated Storage Providers and Capacity Subject to Capacity Release Are More Than Just Theoretically Available, They are Good Alternatives

Opinion 538 concluded that its market analysis was merely theoretical and that "a substantial number" of facilities would, apparently without "[a]ny delay," have to either (a) acquire a Part 284 certificate, and/or (b) release capacity, in order to prevent an exercise of market power by ANR. Opinion 538 at P 219 (JA ___). ANR argued on rehearing that Opinion 538 disregarded the fact that formerly intrastate capacity can timely provide Part 284 service. Opinion 538 itself elsewhere found a good alternative need only be available "soon enough," "not . . . immediately." Opinion 538 at P 163 (JA ___). The Rehearing Order (at P 37 (JA ___)) continued to make conclusory assertions that ANR failed to demonstrate that intrastate capacity could provide Part 284 service in a timely fashion.

The Commission Orders are contrary to substantial evidence. Putting aside that the Rehearing Order contradicted itself,[15] it is well-documented that intrastate storage "can be and has been readily converted into interstate storage capacity when market circumstances so warrant." Ex. ANR-185 at 67:16-17 (JA ___). State-regulated facilities, including facilities in the Market, have been transferred

---

[15] ANR had "established that intrastate storage providers could shift production to interstate storage within" "a relatively short time" allowing inclusion of intrastate storage capacity in the market. *Id.* at P 22 and n.63 (JA ___).

to federal regulation within several months. Distributors have received Part 284 authorizations within 60 days of filing their request, *see*, *e.g.*, *Peoples Natural Gas Co.*, 55 FERC ¶ 62,223 (1991) (authorizing on June 5, 1991 an application filed March 5, 1991), and regularly convert storage capacity in less than one year, as reflected in the following table:

| Order | Time from Application Date to Order Date |
|---|---|
| *Bluewater*, 117 FERC ¶ 61,122 | **5 months** |
| *Transok, LLC*, 97 FERC ¶ 61,362 (2001) | **5 months** |
| *Transok, LLC*, 93 FERC ¶ 61,031 (2000) | **5 months** |
| *Transok, Inc.*, 64 FERC ¶ 61,095 (1993) | **9 months** |
| *Petal Gas Storage, L.L.C.*, 142 FERC ¶ 61,119, *reh'g granted on other grounds*, 143 FERC ¶ 61,272 (2013) | **9 months** |
| *UGI*, 133 FERC ¶ 61,073 | **11 months** |
| *The East Ohio Gas Co.*, 133 FERC ¶ 61,076 (2010) | **7 months (Phase I)** |
| *The East Ohio Gas Co.*, 144 FERC ¶ 61,102 (2013) | **6 months (Phase II)** |
| *Ameren Illinois Co.*, 148 FERC ¶ 62,152 (2014) | **6 months** |
| *New York State Electric & Gas Corp.*, 81 FERC ¶ 61,020 (1997) | **9 months** |
| *Worsham-Steel Gas Storage, L.P.*, 119 FERC ¶ 61,128 (2007) | **5 months** |

| Order | Time from Application Date to Order Date |
|---|---|
| *Freebird Gas Storage, LLC*, 111 FERC ¶ 61,054 (2005) | **5 months** |
| *WPI-ESI*, 108 FERC ¶ 61,061 | **4 months** |
| *Unocal Keystone Storage, L.L.C.*, 100 FERC ¶ 61,310 (2002) | **4 months** |
| *Louisville Gas & Electric Co.*, 99 FERC ¶ 62,040 (2002) | **3 months** |
| *Lee 8 Storage Partnership*, 73 FERC ¶ 62,185 (1995) | **35 days** |
| *Egan Hub*, 95 FERC ¶ 61,395 | **6 months** |

This significant example of supply substitutability recognizes firms' ability to turn their facilities toward supplying goods or services to meet demand because of similarities between the goods or services. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir. 1975). Where the degree of supply substitutability is high, the goods or services are treated as part of the same market.[16] Where sellers can readily switch supply from one group of

---

[16] *Id.*; *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (conversion of full-serve gasoline stations to self-serve); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 360-61 (S.D.N.Y. 1995) (line extensions of existing cereal brands, or switches in the production of companion brands); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995) (physicians could easily shift services from an HMO to a PPO); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n.42 (1962); *United States v. Columbia Steel Co.*, 334 U.S. 495, 510-11 (1948).

customers to another group of customers, the goods or services in the lines of commerce are in competition and part of the same product market. *See*, *e.g*., *Buckeye Pipe Line Co., LP*, 53 FERC ¶ 61,473 at 62,667 n.48 (1990); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc*., 7 F.3d 986, 995 (11th Cir. 1993).

"[T]he relevant market includes all sellers or producers who have actual or potential ability to deprive each other of significant business." *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (citation omitted). Thus the relevant product market consists of "products that have reasonable interchangeability . . ." *United States v. E.I. DuPont de Nemours & Co*., 351 U.S. 377, 404 (1956). The market is not limited to identical products. *Int'l Logistics Group, Ltd. v. Chrysler Corp*., 884 F.2d 904, 908 (6th Cir. 1989). Instead, the test is loose and flexible, requiring only that the products be easily substituted in their end-use. *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 438 (3d Cir. 1997). By imposing on incumbent storage providers a higher hurdle that requires more than sufficient substitutability, Opinion 538 deviates from long-recognized precedent. *See Du Pont*, 351 U.S. at 396, 400 (finding that the market was broader than cellophane only and consisted of other flexible packaging goods); *Brown Shoe Co*., 370 U.S. at 326; *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 718 n.15 (D.C. Cir. 2001); *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co*., 912 F. Supp. 747, 769 (D. N.J. 1995); *Wagner v. Circle*

*W. Mastiffs*, 732 F. Supp. 2d 792, 803-04 (S.D. Ohio 2010) (finding that other breeds of dogs can perform the same function as American Mastiffs for purchasers of companion dogs).

The determinative portion of Opinion 538 also ignored ANR's evidence of the economic drivers that support shifting storage capacity from state to federal regulation. Unsubscribed pipeline capacity, including on Great Lakes Gas Transmission L.P., and rising Marcellus and Utica shale production, incent Distributors and marketers to reduce their holdings of storage capacity; Alternatively, they may release it or assign it to Retail Choice providers. Tr. 455:15-457:22, 467:10-468:8 (JA ___). This in turn incents heretofore state-regulated storage to seek or extend Part 284 authorization. *Id.* Moreover, state commissions require Distributors to provide service at the most economical and efficient possible rate to ratepayers (Tr. 457:13-22 (JA ___)), incenting them to use storage facilities efficiently. Under Retail Choice a Distributor may lose retail demand to marketers, encouraging other uses of the Distributor's storage capacity, *e.g.*, selling it into the interstate market,[17] or assigning it to a Retail Choice provider. In the Dominion-Dominion East Ohio transaction, previously intrastate storage capacity was simply leased to a federally-regulated pipeline, thereby

---

[17]    Tr. 467:10-468:8 (JA ___). *See also Georgia*, 107 FERC ¶ 61,024 (state unbundling).

providing service subject to federal regulation, through a contract change and receipt of authorization. *East Ohio Gas Co*., 133 FERC ¶ 61,076; *East Ohio Gas Co.*, 144 FERC ¶ 61,102 (2013). FERC admits that some ostensibly intrastate pipelines perform predominately *federally-regulated* service, presumably when economically attractive. *See Capacity Transfers on Intrastate Natural Gas Pipelines*, 75 Fed. Reg. 66,046, at 66,049 (P B.5) (2010).

State-regulated storage has been timely and repeatedly transitioned to FERC's jurisdiction. The Commission failed to address these arguments and substantial record evidence.

### 4. Dominion and NiSource

Opinion 538 held that Dominion and NiSource's capacity should be included in the market metrics because "the facility changes required to make [Dominion and NiSource] physically available could occur within a sufficiently brief period of time, and with minimal financial investment, such that [Dominion and NiSource] could serve as a good alternative upon an anti-competitive price increase by [ANR]." Opinion 538 at PP 191, 202 (JA ___). FERC found that "Dominion is also available to customers through the use of exchanges," *id.* at P 191 (JA ___), consistent with evidence discussed *supra* at pp. 43-48. However, on rehearing, the Commission reversed course and held that ANR would have to "provide additional cost data on the anticipated costs of interconnecting"

56

Material Under Seal Deleted

Dominion and NiSource and that Opinion 538's decision was not supported by record evidence. Rehearing Order at P 30 (JA ___). The Rehearing Order is arbitrary and capricious and not based on substantial record evidence.

First, Opinion 538 acknowledged that facilities that are not physically interconnected can still affect the price of ANR's services through exchanges. Opinion 538 at P 219 (JA ___). As described above, exchanges, Retail Choice and displacement can make such capacity available and that capacity affects market prices. The Rehearing Order did not address this evidence or overturn FERC's previous holding that such facilities, like Dominion, are "available to customers through the use of exchanges." *Id.* at P 191 (JA ___). Further, the Rehearing Order is inconsistent with *Orbit*, 126 FERC ¶ 61,095 at P 20, Ex. ANR-65 at 36:6-18, Table 4 (JA ___), that included Dominion and NiSource capacity in the applicant's market metrics.

Second, substantial evidence supports including Dominion and NiSource's capacity as good alternatives to ANR's services. Dominion and NiSource's systems are directly connected -- at multiple points -- to ANR Pipeline. *See, e.g.*, ANR-16 at 5; ANR-6 at 2; ANR-1 at 28. *See* discussion at pp. 43-48, *supra*.

**Material Under Seal Deleted**

Material Under Seal Deleted

Further, Dominion's affiliates have stated that its interstate pipeline will use capacity leased from its affiliated Distributor "to provide service to interstate customers" (Ex. ANR-127 at pp. 1, 12 (JA ___)) as part of "the interstate integrated storage operations" (*Id.* at p. 2 (JA ___)). Dominion was authorized in Docket No. CP12-72 to construct and operate compression facilities (Ex. ANR-127, p. 11 (JA ___)). Clearly, capacity formerly used by Dominion's Ohio Distributor is being made available to serve interstate customers.

### 5.    Eaton Rapids

Eaton Rapids, a storage facility included in the market metric calculations, is owned equally by an unaffiliated Michigan Distributor and TransCanada (ANR's parent). Opinion 538 held that 50% of Eaton Rapids working gas (3,200 MMcf) and daily deliverability capacity (80 MMcf) should be allocated to TransCanada/ANR because ANR did not control Eaton Rapids. Opinion 538 at P 206 (JA ___). ANR sought rehearing of the Commission's decision because it had inadvertently miscalculated the Distributor's working gas and daily deliverability capacity to account for its decision. Rehearing Request at pp. 14-16 (JA ___). The Commission denied ANR's Rehearing Request, instead granting

58

rehearing to the intervenors, finding that 100% of Eaton Rapids' capacity should be allocated to ANR because ANR "did not overcome the presumption that a voting interest of ten percent or more creates a rebuttable presumption of control." Rehearing Order at P 32 (JA ___).  FERC's decision is arbitrary and capricious and contrary to substantial evidence in the record.

ANR/TransCanada does not control all of Eaton Rapids.  Contracts for Eaton Rapids are subject to unanimous partner approval (*i.e.*, ANR/TransCanada cannot enter into any contracts without approval from the other, unaffiliated, partner).  Ex. JIG-10 (JA ___).  Further, all uncontracted capacity must be posted as available and sold to anyone bidding the tariff rate; all contracted capacity is subject to FERC's capacity release program.  *UGI,* 133 FERC ¶ 61,073 at P 44 n.36.  Finally, as a Commission Trial Staff Witness testified, the Eaton Rapids partners are in an ongoing relationship incenting them to not exercise their veto over contracting for new storage service.  Tr. 628:3-13 (JA ___).  Substantial evidence demonstrates that the Commission erred in imputing all of Eaton Rapids' capacity to ANR/TransCanada, and therefore it should be allocated between both the unaffiliated Distributor owner and TransCanada.

### 6.    Market Metric Calculations

Opinion 538 incorrectly calculated ANR's market metrics.  ANR sought rehearing on that basis, but the Commission stated that it would have reached the

same decision regardless of the error. Rehearing Order at P 33 (JA ___). The Commission's derivation of the market metrics is arbitrary and capricious and not based on substantial evidence.

Opinion 538's market metrics calculation contained two types of errors. Opinion 538 at PP 186-213 (JA ___). First, Opinion 538 incorrectly calculated the HHI. Using data recited in Opinion 538, paragraphs 186 - 211 (JA ___), Appendix A to ANR's Rehearing Request (JA ___) re-calculated HHIs and market shares. As shown in that Appendix, Opinion 538 contained incorrect HHIs (P 213 (JA ___)). Second, Opinion 538 incorrectly calculated the market metrics using data from the Initial Decision rather than the updated rebuttal evidence (Ex. ANR-116 (JA ___)). Rehearing Order at P 33 (JA ___). Ironically, Opinion 538 criticized the Initial Decision for improperly ignoring ANR's rebuttal evidence. Opinion 538 at P 57 (JA ___). The updated data, subject to intervenors' discovery and cross-examination, are the most relevant record evidence for assessing ANR's ability to exercise market power.

### 7.    Other Factors

Opinion 538 erroneously concluded that the other factors presented by ANR did not demonstrate that ANR lacks market power. Opinion 538 at P 242 (JA ___). Specifically, Opinion 538 incorrectly concluded that "[e]ntry into the market would unlikely change [ANR's] position as the largest provider of gas

60

storage." *Id.*  ANR sought rehearing of the decision, but the Rehearing Order did not address ANR's arguments.

ANR demonstrated that there is even greater potential for new entry in the Market than in the New York/Pennsylvania market, which FERC has found does not have significant barriers to new entry. *UGI*, 133 FERC ¶ 61,703 at P 100. FERC has held that the existence of areas suitable for storage, such as depleted gas fields, within a market demonstrates that entry is "relatively easy." *Transok*, 93 FERC ¶ 61,031 at 61,066-67.  Under this standard, entry into Michigan, Southwestern Ontario, Ohio, and southern and central Illinois and Indiana is easy: they contain numerous potential storage reservoirs, according to the only reservoir engineer testifying in the case.  Ex. ANR-45 at 24:1-26:7 (JA ___); Exs. ANR-45 through ANR-64 (JA ___).  This includes converting base gas capacity into working gas capacity  *See, e.g.*, *S. Star Cent. Gas Pipeline, Inc.*, 133 FERC ¶ 61,057, at PP 14-16 (2010).  No comparable analysis was sponsored advocating a contrary conclusion.

Further, Opinion 538's conclusion that "[e]ntry into the market would unlikely change [ANR's] position as the largest provider of gas storage" is factually incorrect.  ANR's share of working gas capacity is just 3.63 percent, which is smaller than multiple entities in the Market.  Ex. ANR-116 at page 3,

61

lines 111-114 (JA ___).  Even allowing for the share of TransCanada, Opinion 538

failed to consider that TransCanada (1) in terms of daily deliverability, is not the

largest provider, it is the third largest storage provider, and (2) in terms of working

gas share, holds a share roughly comparable to that of Detroit.  *See* Rehearing

Request at Appendix C (JA ___).

In just two years Detroit's working gas capacity increased by 4,586 MMcf.

*Compare* Ex. ANR-7 at p. 1 *with* Ex. ANR-116 at p. 1 (JA ___).  Therefore,

*without any price inducement from ANR*, Detroit is expanding its working gas

capacity.

Further, the Market's total working gas capacity increased by slightly less

than 13,000 MMcf in just over a year.  *Id.* at p. 3 (JA ___).  Therefore, during a

period when ANR lacked market based rates, storage capacity increased

sufficiently to replace about *23 percent of ANR's total working gas capacity*.[18]

This occurred while seasonal differences in natural gas prices -- historically a

major driver in storage demand and prices -- have greatly diminished.  Ex. ANR-

128 at pp. 5-30 (JA ___).

---

[18]  12,725 MMcf of increased working gas capacity divided by 56,118 MMcf of
ANR Storage's working gas capacity.  *See* Rehearing Request at Appendices B
and C (JA ___).

The Commission Orders are arbitrary and capricious and contrary to substantial evidence in the record because the Commission dismissed, in a conclusory fashion, evidence in the record demonstrating ease of entry in the Market.

### 8.    ANR's Proposed Mitigation Measures

Opinion 538 failed to address ANR's proposed mitigation measures and analyze whether that mitigation would resolve any of FERC's concerns.  *See Policy Statement*, 74 FERC ¶ 61,076 at 61,230.  ANR sought rehearing, but the Rehearing Order did not address ANR's mitigation proposal.  The Commission's failure to address ANR's proposal is arbitrary and capricious and not the product of reasoned decision making.

Consistent with ANR's contracts ANR could have proposed to "change the customers' rates to market based rates during the terms of their contracts pursuant to a filing under section 4 of the NGA."  *UGI*, 133 FERC ¶ 61,073 at P 82.  *See also* Order 678-A, 117 FERC ¶ 61,190 at P 7.  Nonetheless, as a transitional step, ANR proposed a one year transition period for recourse rate customers.  Petition at pp. 53-55 (JA____); Rehearing Request at pp. 62-63 (JA __).  The mitigation tool would further protect ANR's existing customers, allowing them to elect to cease service in lieu of paying ANR market based rates.  However, the Commission

failed to address the mitigation proposal.  The Commission's Orders therefore are

arbitrary and capricious.

**CONCLUSION**

For the foregoing reasons, ANR respectfully requests that the Court vacate

FERC's orders and remand with instructions.

Respectfully submitted,

*/s/ Mark Sundback*
Mark Sundback
Kenneth Wiseman
William Rappolt
Andrews Kurth Kenyon LLP
1350 I Street, NW, Suite 1100
Washington, DC 20005
Tel: (202) 662-2700
Fax: (202) 662-2739
E-mail: msundback@andrewskurth.com
    kwiseman@andrewskurth.com
    wrappolt@andrewskurth.com

ATTORNEYS FOR ANR STORAGE COMPANY

Dated January 17, 2017

65

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 28(a)(10) and 32(a)(7)(C), that the foregoing brief was prepared in 14-point Times New Roman font, and contains 12,889 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1).

*/s/ William Rappolt*
William Rappolt

Dated: January 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(d)(2), that on January 17, 2017, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record for this matter, who are registered with the Court's CM/ECF system. In addition, two copies of the version of the Initial Brief that was filed under seal have been served by U.S. Mail to the attorneys of record for this matter.

/s/ William Rappolt
William Rappolt

Dated: January 17, 2017

67

# Attachment A

PUBLIC VERSION

1                                     **Table 4**

| Company | Working Gas Capacity (Bcf) | | Capacity Included in the Market Share and HHI Calculations Referenced by Commission Orders Granting MBR[*] |
| | Exhibit No. ANR-7 | Exhibit No. JIG-33 Broad G.L. Region | |
|---|---|---|---|
| Ameren Corp. | 25,765 | 0 | Bluewater (N. Illinois facilities, 9.80 Bcf), Orbit (10.65 Bcf) |
| Bluewater Gas Storage, LLC | 29,200 | 25,700 | Bluewater (29.25 Bcf, inclusive of WPS facility) |
| Centerpoint Energy | 1,600 | 1,600 | Orbit (2.20 Bcf) |
| CMS Energy Corp. | 178,740 | 0 | Bluewater (136.55 Bcf) |
| DTE Energy | 207,628 | 142,267 | Bluewater (176.67 Bcf) |
| Dominion - East Ohio | 63,120 | 5,000 | Orbit (58.86 Bcf) |
| Enbridge Inc. | 100,946 | 16,700 | Bluewater (90.16 Bcf) |
| Integrys (MGU, Peoples Energy) | 42,137 | 0 | Bluewater (31.71 Bcf, including Peoples Energy and MGU), Orbit (28.00 Bcf) |
| Kinder Morgan Inc. -NGPL | 82,757 | 82,757 | Bluewater (69.60 Bcf), Orbit (69.60 Bcf) |
| Loews Corp. - Texas Gas | 4,996 | 4,996 | Orbit (72.22 Bcf) |
| NGO Transmission Inc. | 2,215 | 0 | Orbit (2.32 Bcf) |
| Nicor Inc. - N. IL Gas | 149,740 | 0 | Bluewater (144.30 Bcf), Orbit (144.30 Bcf) |
| NiSource, Inc. - Columbia | 169,065 | 162,083 | Orbit (145.98 Bcf) |
| ProLiance - Vectren/Citizens | 732 | 0 | Orbit (21.30 Bcf, consolidated with Robinson Engineering) |
| Robinson Engineering | 925 | 0 | Orbit (21.30 Bcf, consolidated with ProLiance) |
| SEMCO Energy Inc. | 11,264 | 0 | Bluewater (5.02 Bcf) |
| Southern Union Co. - ETP | 25,224 | 25,225 | Bluewater (22.30 Bcf) |
| Spectra Energy (Union Gas) | 158,095 | 70,674 | Bluewater (143.88 Bcf) |
| Vectren Corp. | 12,917 | 0 | Bluewater (2.53 Bcf) |

* See Bluewater Gas Storage, LLC ("Bluewater") Market Power Study, at Exhibit No. ANR-110 at 13-18, and Orbit Gas Storage Market Power Study, at Exhibit No. ANR-69 at 14-20.

2          Please note that that the geographic market definitions used in *Bluewater* and *Orbit* are

3          not identical to the Central Great Lakes Market.  As can be seen in the Table 4 above,

4          much of the storage capacity (and all of the storage entities) excluded by Witness Wilson

5          for being intrastate storage has been included in the market-power metrics relied upon by

Attachment B

Public Copy - Sealed Material Deleted

# APPENDIX

## ADDENDUM OF STATUTES AND REGULATIONS

**Administrative Procedure Act**

    5 U.S.C. § 706 (2012)

**Natural Gas Act**

    15 U.S.C. § 717b (2012)

    15 U.S.C. § 717c (2012)

    15 U.S.C. § 717r (2012)

**Natural Gas Policy Act**

    15 U.S.C. § 3371 (2012)

**Code of Federal Regulations**

    18 C.F.R. § 284.8 (2016)

    18 C.F.R. § 284.122 (2016)

    18 C.F.R. § 284.221 (2016)

    18 C.F.R. § 284.224 (2016)

    18 C.F.R. Part 284, Subpart M (2016)

**<u>Administrative Procedure Act, 5 U.S.C. § 706 (2012)</u>**

**Scope of Review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> (B) contrary to constitutional right, power, privilege, or immunity;

>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> (D) without observance of procedure required by law;

>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Natural Gas Act, Section 3, 15 U.S.C. § 717b (2012)**

**Exportation or importation of natural gas; LNG terminals**

(a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

(b) Free trade agreements  With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—

> (1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

> (2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

(c) Expedited application and approval process

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

(d) Construction with other lawsExcept as specifically provided in this chapter, nothing in this chapter affects the rights of States under—

> (1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

(e) LNG terminals

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b–1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)

(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find [1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not—

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on—

4

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

(f) Military installations

(1) In this subsection, the term "military installation"—

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

## Natural Gas Act, Section 4, 15 U.S.C. § 717c (2012)

**Rates and Charges**

(a) Just and reasonable rates and charges

All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

(b) Undue preferences and unreasonable rates and charges prohibited

No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Filing of rates and charges with Commission; public inspection of schedules

Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Changes in rates and charges; notice to Commission

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for

7

good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Authority of Commission to hold hearings concerning new schedule of rates

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Storage services

(1) In exercising its authority under this chapter or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that--

> (A) market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

> (B) customers are adequately protected.

(2) The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

(3) If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.

## Natural Gas Act, Section 19, 15 U.S.C. § 717r (2012)

**Rehearing and Review**

(a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in

10

whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(c) Stay of Commission order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(d) Judicial review

(1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval

11

(hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

(2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

(3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title , the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

(4) Commission action

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

(5) Expedited review

The Court shall set any action brought under this subsection for expedited consideration.

12

**Natural Gas Policy Act, Section 311, 15 U.S.C. § 3371 (2012)**

**Authorization of certain sales and transportation**

(a) Commission approval of transportation

(1) Interstate pipelines

(A) In general

The Commission may, by rule or order, authorize any interstate pipeline to transport natural gas on behalf of--

(i) any intrastate pipeline; and

(ii) any local distribution company.

(B) Just and reasonable rates

The rates and charges of any interstate pipeline with respect to any transportation authorized under subparagraph (A) shall be just and reasonable (within the meaning of the Natural Gas Act [15 U.S.C.A. 717 et seq.]).

(2) Intrastate pipelines

(A) In general

The Commission may, by rule or order, authorize any intrastate pipeline to transport natural gas on behalf of--

(i) any interstate pipeline; and

(ii) any local distribution company served by any interstate pipeline.

(B) Rates and charges

(i) Maximum fair and equitable price

The rates and charges of any intrastate pipeline with respect to any transportation authorized under subparagraph (A), including any amount computed in

13

accordance with the rule prescribed under clause (ii), shall be fair and equitable and may not exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service.

(ii) Commission Rule

The Commission shall, by rule, establish the method for calculating an amount necessary to--

(I) reasonably compensate any intrastate pipeline for expenses incurred by the pipeline and associated with the providing of any gathering, treatment, processing, transportation, delivery, or similar service provided by such pipeline in connection with any transportation of natural gas authorized under subparagraph (A); and

(II) provide an opportunity for such pipeline to earn a reasonable profit on such services.

(b) Commission approval of sales

(1) In general

The Commission may, by rule or order, authorize any intrastate pipeline to sell natural gas to--

(A) any interstate pipeline; and

(B) any local distribution company served by any interstate pipeline.

(2) Rates and charges

(A) Maximum fair and equitable price

The rates and charges of any intrastate pipeline with respect to any sale of natural gas authorized under paragraph (1) shall be fair and equitable and may not exceed the sum of--

14

(i) such intrastate pipeline's weighted average acquisition cost of natural gas;

(ii) an amount, computed in accordance with the rule prescribed under subparagraph (B); and

(iii) any adjustment permitted under subparagraph (C).

(B) Commission rule

The Commission shall, by rule, establish the method for calculating an amount necessary to--

(i) reasonably compensate any intrastate pipeline for expenses incurred by the pipeline and associated with the providing of any gathering, treatment, processing, transportation, or delivery service provided by such pipeline in connection with any sale of natural gas authorized under paragraph (1); and

(ii) provide an opportunity for such pipeline to earn a reasonable profit on such services.

(C) Adjustment

(i) Application

This subparagraph shall apply in any case in which, in order to deliver any volume of natural gas pursuant to any sale authorized under paragraph (1), any intrastate pipeline acquires quantities of natural gas under any existing contract, if--

(I) such intrastate pipeline acquires any volume of natural gas under such contract in excess of that which such pipeline would otherwise have acquired; and

(II) the price paid for such additional volume of natural gas acquired under such contract is greater than such pipeline's weighted average acquisition cost of natural gas, computed without regard to the

15

acquisition of such additional volume of natural gas.

(ii) Commission adjustment

In any case to which this subparagraph applies, the Commission shall permit an adjustment to the maximum fair and equitable price provided under subparagraph (A) to increase the revenue to the intrastate pipeline under such sale by an amount determined by the Commission to be adequate to offset the additional cost incurred by such pipeline due to any increase in such pipeline's weighted average acquisition cost of natural gas.

(3) Limitation

(A) Two-year duration

No authorization of any sale (or any extension thereof) under paragraph (1) may be for a period exceeding two years.

(B) Extension

Any authorization of any sale under paragraph (1), and any extension of any such authorization under this subparagraph, may be extended by the Commission if such extension satisfies the requirements of this subsection.

(4) Adequacy of service to intrastate customers

Any sale authorized under paragraph (1) shall be subject to interruption to the extent that natural gas subject to such sale is required to enable the intrastate pipeline involved to provide adequate service to such pipeline's customers at the time of such sale.

(5) Procedural requirements

(A) Affidavit

Any application for authorization of any sale under paragraph (1) shall be accompanied by an affidavit filed by the intrastate pipeline involved and setting forth--

16

(i) the identity of the interstate pipeline or local distribution company involved;

(ii) each point of delivery of the natural gas from the intrastate pipeline;

(iii) the estimated total and daily volumes of natural gas subject to such sale;

(iv) the price or prices of such volumes; and

(v) such other information as the Commission may, by rule, require.

(B) Verification of compliance

Any application for authorization of any sale under paragraph (1) shall be accompanied by a statement by the intrastate pipeline involved verifying by oath or affirmation that such sale, if authorized, would comply with all requirements applicable to such sale under this subsection and all terms and conditions established, by rule or order, by the Commission and applicable to such sale.

(6) Termination of sales

(A) Hearing

Upon complaint of any interested person, or upon the Commission's own motion, the Commission shall, after affording an opportunity for oral presentation of views and arguments, terminate any sale authorized under paragraph (1) if the Commission determines--

(i) such termination is required to enable the intrastate pipeline involved to provide adequate service to the customers of such pipeline at the time of such sale;

(ii) such sale involves the sale of natural gas acquired by the intrastate pipeline involved solely or primarily for the purpose of resale of such natural gas pursuant to a sale authorized under paragraph (1);

17

(iii) such sale violates any requirement of this subsection or any term or condition established, by rule or order, by the Commission and applicable to such sale; or

(iv) such sale circumvents or violates any provision of this chapter.

(B) Suspension pending hearing

Prior to any hearing or determination required under subparagraph (A), upon complaint of any interested person or upon the Commission's own motion, the Commission may suspend any sale authorized under paragraph (1) if the Commission finds that it is likely that the determinations described in subparagraph (A) will be made following the hearing required under subparagraph (A).

(C) Determination

The determination of whether any interruption of any sale authorized under paragraph (1) is required under subparagraph (A)(i) shall be made by the Commission without regard to the character of the use of natural gas by any customer of the intrastate pipeline involved.

(D) State intervention

Any interested State may intervene as a matter of right in any proceeding before the Commission relating to any determination under this section.

(7) Disapproval of application

The Commission shall disapprove any application for authorization of any sale under paragraph (1) if the Commission determines--

(A) such sale would impair the ability of the intrastate pipeline involved to provide adequate service to its customers at the time of such sale (without regard to the character of the use of natural gas by such customer);

18

(B) such sale would involve the sale of natural gas acquired by the intrastate pipeline involved solely or primarily for the purpose of resale of such natural gas pursuant to a sale authorized under paragraph (1);

(C) such sale would violate any requirement of this subsection or any term or condition established, by rule or order, by the Commission and applicable to such sale; or

(D) such sale would circumvent or violate any provision of this chapter.

(c) Terms and conditions

Any authorization granted under this section shall be under such terms and conditions as the Commission may prescribe.

## Code of Federal Regulations, 18 C.F.R. § 284.8 (2016)

**Release of Firm Capacity on Interstate Pipelines**

(a) An interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part must include in its tariff a mechanism for firm shippers to release firm capacity to the pipeline for resale by the pipeline on a firm basis under this section.

(b)(1) Firm shippers must be permitted to release their capacity, in whole or in part, on a permanent or short-term basis, without restriction on the terms or conditions of the release. A firm shipper may arrange for a replacement shipper to obtain its released capacity from the pipeline. A replacement shipper is any shipper that obtains released capacity.

> (2) The rate charged the replacement shipper for a release of capacity may not exceed the applicable maximum rate, except that no rate limitation applies to the release of capacity for a period of one year or less if the release is to take effect on or before one year from the date on which the pipeline is notified of the release. Payments or other consideration exchanged between the releasing and replacement shippers in a release to an asset manager as defined in paragraph (h)(3) of this section are not subject to the maximum rate.

(c) Except as provided in paragraph (h) of this section, a firm shipper that wants to release any or all of its firm capacity must notify the pipeline of the terms and conditions under which the shipper will release its capacity. The firm shipper must also notify the pipeline of any replacement shipper designated to obtain the released capacity under the terms and conditions specified by the firm shipper.

(d) The pipeline must provide notice of offers to release or to purchase capacity, the terms and conditions of such offers, and the name of any replacement shipper designated in paragraph (b) of this section, on an Internet web site, for a reasonable period.

(e) The pipeline must allocate released capacity to the person offering the highest rate and offering to meet any other terms and conditions of the release. If more than one person offers the highest rate and meets the terms and conditions of the release, the released capacity may be allocated on a basis provided in the pipeline's tariff, provided however, if the replacement shipper designated in paragraph (b) of

20

this section offers the highest rate, the capacity must be allocated to the designated replacement shipper.

(f) Unless otherwise agreed by the pipeline, the contract of the shipper releasing capacity will remain in full force and effect, with the net proceeds from any resale to a replacement shipper credited to the releasing shipper's reservation charge.

(g) To the extent necessary, a firm shipper on an interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part is granted a limited-jurisdiction blanket certificate of public convenience and necessity pursuant to section 7 of the Natural Gas Act solely for the purpose of releasing firm capacity pursuant to this section.

(h)(1) The following releases need not comply with the bidding requirements of paragraphs (c) through (e) of this section:

> (i) A release of capacity to an asset manager as defined in paragraph (h)(3) of this section;

> (ii) A release of capacity to a marketer participating in a state-regulated retail access program as defined in paragraph (h)(4) of this section;

> (iii) A release for more than one year at the maximum tariff rate; and

> (iv) A release for any period of 31 days or less.

> (v) If a release is exempt from bidding under paragraph (h)(1) of this section, notice of the release must be provided on the pipeline's Internet Web site as soon as possible, but not later than the first nomination, after the release transaction commences.

(2) When a release of capacity is exempt from bidding under paragraph (h)(1)(iv) of this section, a firm shipper may not roll over, extend or in any way continue the release to the same replacement shipper using the 31 days or less bidding exemption until 28 days after the first release period has ended. The 28–day hiatus does not apply to any re-release to the same replacement shipper that is posted for bidding or that qualifies for any of the other exemptions from bidding in paragraph (h)(1) of this section.

21

(3) A release to an asset manager exempt from bidding requirements under paragraph (h)(1)(i) of this section is any pre-arranged release that contains a condition that the releasing shipper may call upon the replacement shipper to deliver to, or purchase from, the releasing shipper a volume of gas up to 100 percent of the daily contract demand of the released transportation or storage capacity, as provided in paragraphs (h)(3)(i) through (h)(3)(iii) of this paragraph.

(i) If the capacity release is for a period of one year or less, the asset manager's delivery or purchase obligation must apply on any day during a minimum period of the lesser of five months (or 155 days) or the term of the release.

(ii) If the capacity release is for a period of more than one year, the asset manager's delivery or purchase obligation must apply on any day during a minimum period of five months (or 155 days) of each twelve-month period of the release, and on five-twelfths of the days of any additional period of the release not equal to twelve months.

(iii) If the capacity release is a release of storage capacity, the asset manager's delivery or purchase obligation need only be up to 100 percent of the daily contract demand under the release for storage withdrawals or injections, as applicable.

(4) A release to a marketer participating in a state-regulated retail access program exempt from bidding requirements under paragraph (h)(1)(ii) of this section is any prearranged capacity release that will be utilized by the replacement shipper to provide the gas supply requirement of retail consumers pursuant to a retail access program approved by the state agency with jurisdiction over the local distribution company that provides delivery service to such retail consumers.

(i) [Reserved by 73 FR 37092]

22

## Code of Federal Regulations, 18 C.F.R. § 284.122 (2016)

**Transportation by Intrastate Pipelines**

(a) Subject to paragraph (d) of this section, other provisions of this subpart, and the applicable conditions of Subpart A of this part, any intrastate pipeline may, without prior Commission approval, transport natural gas on behalf of:

> (1) Any interstate pipeline; or

> (2) Any local distribution company served by an interstate pipeline.

(b) No rate charged for transportation authorized under this subpart may exceed a fair and equitable rate under § 284.123.

(c) Any intrastate pipeline engaged in transportation arrangements authorized under this section must file reports as required by § 284.126.

(d) Transportation of natural gas is not on behalf of an interstate pipeline or local distribution company served by an interstate pipeline or authorized under this section unless:

> (1) The interstate pipeline or local distribution company has physical custody of and transports the natural gas at some point; or

> (2) The interstate pipeline or local distribution company holds title to the natural gas at some point, which may occur prior to, during, or after the time that the gas is being transported by the intrastate pipeline, for a purpose related to its status and functions as an interstate pipeline or its status and functions as a local distribution company.

**Code of Federal Regulations, 18 C.F.R. § 284.221 (2016)**

**General Rule; Transportation by Interstate Pipelines on Behalf of Others**

(a) Blanket certificate. Any interstate pipeline may apply under this section for a single blanket certificate authorizing the transportation of natural gas on behalf of others in accordance with this subpart. A certificate of public convenience and necessity under this section is granted pursuant to section 7 of the Natural Gas Act.

(b) Application procedure.

(1) An application for a blanket certificate under this section must be filed electronically. The format for the electronic application filing can be obtained at the Federal Energy Regulatory Commission, Division of Information Services, Public Reference and Files Maintenance Branch, Washington, DC 20426, and must include:

(i) The name of the interstate pipeline; and

(ii) A statement by the interstate pipeline that it will comply with the conditions in paragraph (c) of this section.

(2) Upon receipt of an application under this section, the Commission will conduct a hearing pursuant to section 7(c) of the Natural Gas Act and § 157.11 of this chapter and, if required by the public convenience and necessity, will issue to the interstate pipeline a blanket certificate authorizing such pipeline company to transport natural gas, as provided under this subpart.

(c) General conditions. Any blanket certificate under this subpart is subject to the conditions of subpart A of this part.

(d) Pre-grant of abandonment.

(1) Except as provided in paragraph (d)(2) of this section, abandonment of transportation services is authorized pursuant to section 7(b) of the Natural Gas Act upon the expiration of the contractual term or upon termination of each individual transportation arrangement authorized under a certificate granted under this section.

(2) Paragraph (d)(1) of this section does not apply if the individual transportation arrangement is for firm transportation under a contract with a term of one year or more, and the firm shipper:

(i) Exercises any contractual right to continue such service; or

(ii) Gives notice that it wants to continue its transportation arrangement and will match the longest term and highest rate for its firm service, up to the applicable maximum rate under § 284.10, offered to the pipeline during the period established in the pipeline's tariff for receiving such offers by any other person desiring firm capacity, and executes a contract matching the terms of any such offer. To be eligible to exercise this right of first refusal, the firm shipper's contract must be for service for twelve consecutive months or more at the applicable maximum rate for that service, except that a contract for more than one year, for a service which is not available for 12 consecutive months, would be subject to the right of first refusal.

(e) Availability of regular certificates. This subpart does not preclude an interstate pipeline from applying for an individual certificate of public convenience and necessity for any particular transportation service.

(f) Cross references.

(1) Any local distribution company served by an interstate pipeline may apply for a blanket certificate to perform certain services under § 284.224 of this chapter.

(2) Any interstate pipeline may apply under subpart F of part 157 of this chapter for a blanket certificate to construct or acquire and operate certain natural gas facilities that are necessary to provide transportation under § 284.223.

(3) Section 157.208 of this chapter provides automatic authorization for the construction, acquisition, operation, replacement, and miscellaneous rearrangement of certain eligible facilities, as defined in § 157.202 of this chapter, subject to limits specified in § 157.208(d) of this chapter and § 284.11.

(4) Authorization for delivery points is subject to the automatic authorization under § 157.211(a)(1) and the prior notice procedures under § 157.211(a)(2) and § 157.205.

(g) Flexible receipt point authority.

(1) An interstate pipeline authorized to transport gas under a certificate granted under this section may, at the request of the shipper and without prior notice:

(i) Reduce or discontinue receipts of natural gas at a particular receipt point from a supplier; and

(ii) Commence or increase receipts at a particular receipt point from that supplier or any other supplier.

(2) The total natural gas volumes received by the interstate pipeline following any such reassignment under this paragraph must not exceed the total volume of natural gas that the interstate pipeline may transport on behalf of the shipper under a certificate granted under this section.

(3) The receipt points to which natural gas volumes may be reassigned under this paragraph include eligible facilities under § 157.208 which are authorized to be constructed and operated pursuant to a certificate issued under subpart F of part 157 of this chapter.

(h) Flexible delivery point authority.

(1) An interstate pipeline authorized to transport gas under a certificate issued pursuant to this section may at the request of the shipper and without prior notice:

(i) Reduce or discontinue deliveries of natural gas to a particular delivery point; and

(ii) Commence or increase deliveries at a particular delivery point.

(2) The total natural gas volumes delivered by the interstate pipeline following any such reassignment must not exceed the total amount of natural gas that the interstate pipeline is authorized under a certificate issued pursuant to this section to transport on behalf of the shipper.

26

(3) The delivery points to which natural gas volumes may be reassigned under this paragraph include facilities authorized to be constructed and operated only under § 157.211 and the prior notice conditions of § 157.205 of this chapter.

## Code of Federal Regulations, 18 C.F.R. § 284.224 (2016)

**Certain Transportation and Sales by Local Distribution Companies**

(a) Applicability. This section applies to local distribution companies served by interstate pipelines, including persons who are not subject to the jurisdiction of the Commission, by reason of section 1(c) of the Natural Gas Act.

(b) Blanket certificate—

> (1) Any local distribution company served by an interstate pipeline or any Hinshaw pipeline may apply for a blanket certificate under this section.

> (2) Upon application for a certificate under this section, a hearing will be conducted under section 7(c) of the Natural Gas Act, § 157.11 of this chapter, and subpart H of part 385 of this chapter.

> (3) The Commission will grant a blanket certificate to such local distribution company or Hinshaw pipeline under this section, if required by the present or future public convenience and necessity. Such certificate will authorize the local distribution company to engage in the sale or transportation of natural gas that is subject to the Commission's jurisdiction under the Natural Gas Act, to the same extent that and in the same manner that intrastate pipelines are authorized to engage in such activities by subparts C and D of this part, except as otherwise provided in paragraph (e)(2) of this section.

(c) Application procedure. Applications for blanket certificates must be accompanied by the fee prescribed in § 381.207 of this chapter or a petition for waiver pursuant to § 381.106 of this chapter, and shall state:

> (1) The exact legal name of applicant; its principal place of business; whether an individual, partnership, corporation or otherwise; the state under the laws of which it is organized or authorized; the agency having jurisdiction over rates and tariffs; and the name, title, and mailing address of the person or persons to whom communications concerning the application are to be addressed;

> (2) The volumes of natural gas which:

>> (i) Were received during the most recent 12–month period by the applicant within or at the boundary of a state, and

28

(ii) Were exempt from the Natural Gas Act jurisdiction of the Commission by reason of section 1(c) of the Natural Gas Act, if any;

(3) The total volume of natural gas received by the applicant from all sources during the same time period;

(4) Citation to all currently valid declarations of exemption issued by the Commission under section 1(c) of the Natural Gas Act if any;

(5) A statement that the applicant will comply with the conditions in paragraph (e) of this section;

(6) A form of notice suitable for publication in the Federal Register, as contemplated by § 157.9 of this chapter, which will briefly summarize the facts contained in the application in such way as to acquaint the public with its scope and purpose; and

(7) A statement of the methodology to be used in calculating rates for services to be rendered, setting forth any elections under § 284.123 or paragraph (e)(2) of this section and a sample calculation employing the methodology using current data. If a rate election is made under paragraph (e)(2) of this section, this statement shall contain the following items (reflecting the 12–month period used to justify costs in the most recently approved rate case conducted by an appropriate state regulatory agency):

(i) Total operating revenues,

(ii) Purchase gas costs,

(iii) Distribution costs (which include that portion of the common costs allocated to the distribution function),

(iv) The volume throughput of the system categorized by sales, transportation and exchange service, and

(v) A study which determines transportation costs on a unit revenue basis in accordance with paragraph (e)(2) of this section, including any supporting work papers.

(d) Effect of certificate.

29

(1) Any certificate granted under this section will authorize the certificate holder to engage in transactions of the type authorized by subparts C and D of this part.

(2) Acceptance of a certificate or conduct of an activity authorized thereunder will:

(i) Not impair the continued validity of any exclusion under section 1(c) of the Natural Gas Act which may be applicable to the certificate holder, and

(ii) Not subject the certificate holder to the Natural Gas Act jurisdiction to the Commission except to the extent necessary to enforce the terms and conditions of the certificate.

(e) General conditions.

(1) Except as provided in paragraph (e)(2) of this section, any transaction authorized under a blanket certificate is subject to the same rates and charges, terms and conditions, and reporting requirements that apply to a transaction authorized for an intrastate pipeline under subparts C and D of this part.

(2) Rate election. If the certificate holder does not have any existing rates on file with the appropriate state regulatory agency for city-gate service, the certificate holder may make the rate election specified in § 284.123(b)(1) only if:

(i) The certificate holder's existing rates are approved by an appropriate state regulatory agency,

(ii) The rates and charges for any transportation are computed by using the portion of the certificate holder weighted average annual unit revenue (per MMBtu) generated by existing rates which is attributable to the cost of gathering, treatment, processing, transportation, delivery or similar service (including storage service), and

(iii) The Commission has approved the method for computing rates and charges specified in paragraph (e)(2)(ii) of this section.

30

(3) Volumetric test. The volumes of natural gas sold or assigned under the blanket certificate may not exceed the volumes obtained from sources other than interstate supplies.

(4) Filings. Any filings made with the Commission that report individual transactions shall reference the docket number of the proceeding in which the blanket certificate was granted.

(5) Filing Requirements. Filings under this section must comply with the requirements of § 284.123 (f) of this part. The tariff filing requirements of Part 154 of this chapter shall not apply to transactions authorized by the blanket certificate.

(f) Pregrant of abandonment. Abandonment of transportation services or sales, pursuant to section 7(b) of the Natural Gas Act, is authorized upon the expiration of the contractual term of each individual arrangement authorized by a blanket certificate under this section.

(g) Hinshaw pipeline without blanket certificate. A Hinshaw pipeline that does not obtain a blanket certificate under this section is not authorized to sell or transport natural gas as an intrastate pipeline under subparts C and D of this part.

(h) Definitions. For the purposes of this section:

(1) A Hinshaw pipeline means any person engaged in the transportation of natural gas which is not subject to the jurisdiction of the Commission under the Natural Gas Act solely by reason of section 1(c) of the Natural Gas Act.

(2) Interstate supplies means any natural gas obtained, either directly or indirectly, from:

(i) The system supplies of an interstate pipeline, or

(ii) Natural gas reserves which were committed or dedicated to interstate commerce on November 8, 1978.

## Code of Federal Regulations, 18 C.F.R. Part 284, Subpart M (2016)

### Applications for Market-Based Rates for Storage

### 18 C.F.R. § 284.501 Applicability

Any pipeline or storage service provider that provides or will provide service under subparts B, C, or G of this part, and that wishes to provide storage and storage-related services at market-based rates must conform to the requirements in subpart M.

### 18 C.F.R. § 284.502 Procedures for applying for market-based rates

(a) Applications for market-based rates may be filed with certificate applications. Service, notice, intervention, and protest procedures for such filings will conform with those applicable to the certificate application.

(b) With respect to applications not filed as part of certificate applications,

(1) Applicants providing service under subpart B or subpart G of this part must file a request for declaratory order and comply with the service and filing requirements of part 154 of this chapter. Interventions and protests to applications for market-based rates must be filed within 30 days of the application unless the notice issued by the Commission provides otherwise. An applicant providing service under subpart B or subpart G of this part cannot charge market-based rates under this subpart of this part until its application has been accepted by the Commission. Once accepted, the applicant can make the appropriate filing necessary to set its market-based rates into effect.

(2) Applicants providing service under subpart C of this part must file in accordance with the requirements of that subpart.

### 18 C.F.R. § 284.503 Market-Power Determination

An applicant may apply for market-based rates by filing a request for a market-power determination that complies with the following:

(a) The applicant must set forth its specific request and adequately demonstrate that it lacks market power in the market to be served, and must include an executive summary of its statement of position and a statement of

32

material facts in addition to its complete statement of position. The statement of material facts must include citation to the supporting statements, exhibits, affidavits, and prepared testimony.

(b) The applicant must include with its application the following information:

(1) Statement A—geographic market. This statement must describe the geographic markets for storage services in which the applicant seeks to establish that it lacks significant market power. It must include the market related to the service for which it proposes to charge market-based rates. The statement must explain why the applicant's method for selecting the geographic markets is appropriate.

(2) Statement B—product market. This statement must identify the product market or markets for which the applicant seeks to establish that it lacks significant market power. The statement must explain why the particular product definition is appropriate.

(3) Statement C—the applicant's facilities and services. This statement must describe the applicant's own facilities and services, and those of all parent, subsidiary, or affiliated companies, in the relevant markets identified in Statements A and B in paragraphs (b)(1) and (2) of this section. The statement must include all pertinent data about the storage facilities and services.

(4) Statement D—competitive alternatives. This statement must describe available alternatives in competition with the applicant in the relevant markets and other competition constraining the applicant's rates in those markets. Such proposed alternatives may include an appropriate combination of other storage, local gas supply, LNG, financial instruments and pipeline capacity. These alternatives must be shown to be reasonably available as a substitute in the area to be served soon enough, at a price low enough, and with a quality high enough to be a reasonable alternative to the applicant's services. Capacity (transportation, storage, LNG, or production) owned or controlled by the applicant and affiliates of the applicant in the relevant market shall be clearly and fully identified and may not be considered as alternatives competing with the applicant. Rather, the capacity of an applicant's affiliates is to be included in the market

33

share calculated for the applicant. To the extent available, the statement must include all pertinent data about storage or other alternatives and other constraining competition.

(5) Statement E—potential competition. This statement must describe potential competition in the relevant markets. To the extent available, the statement must include data about the potential competitors, including their costs, and their distance in miles from the applicant's facilities and major consuming markets. This statement must also describe any relevant barriers to entry and the applicant's assessment of whether ease of entry is an effective counter to attempts to exercise market power in the relevant markets.

(6) Statement F—maps. This statement must consist of maps showing the applicant's principal facilities, pipelines to which the applicant intends to interconnect and other pipelines within the area to be served, the direction of flow of each line, the location of the alternatives to the applicant's service offerings, including their distance in miles from the applicant's facility. The statement must include a general system map and maps by geographic markets. The information required by this statement may be on separate pages.

(7) Statement G—market-power measures. This statement must set forth the calculation of the market concentration of the relevant markets using the Herfindahl–Hirschman Index. The statement must also set forth the applicant's market share, inclusive of affiliated service offerings, in the markets to be served. The statement must also set forth the calculation of other market-power measures relied on by the applicant. The statement must include complete particulars about the applicant's calculations.

(8) Statement H—other factors. This statement must describe any other factors that bear on the issue of whether the applicant lacks significant market power in the relevant markets. The description must explain why those other factors are pertinent.

(9) Statement I—prepared testimony. This statement must include the proposed testimony in support of the application and will serve as the applicant's case-in-chief, if the Commission sets the application for hearing. The proposed witness must subscribe to the testimony and

34

swear that all statements of fact contained in the proposed testimony are true and correct to the best of his or her knowledge, information, and belief.

## 18 C.F.R. § 284.504 Standard requirements for market-power authorizations

(a) Applicants granted the authority to charge market-based rates under § 284.503 that provide cost-based service(s) must separately account for all costs and revenues associated with facilities used to provide the market-based services. When it files to change its cost-based rates, applicant must provide a summary of the costs and revenues associated with market-based rates with applicable cross references to §§ 154.312 and 154.313 of this chapter. The summary statement must provide the formulae and explain the bases used in the allocation of common costs between the applicant's cost-based services and its market-based services.

(b) A storage service provider granted the authority to charge market-based rates under § 284.503 is required to notify the Commission within 10 days of acquiring knowledge of significant changes occurring in its market power status. Such notification should include a detailed description of the new facilities/services and their relationship to the storage service provider. Significant changes include, but are not limited to:

> (1) The storage provider expanding its storage capacity beyond the amount authorized in this proceeding;

> (2) The storage provider acquiring transportation facilities or additional storage capacity;

> (3) An affiliate providing storage or transportation services in the same market area; and

> (4) The storage provider or an affiliate acquiring an interest in or is acquired by an interstate pipeline.

## 18 C.F.R. § 284.505 Market-based rates for storage providers without a market-power determination

(a) Any storage service provider seeking market-based rates for storage capacity, pursuant to the authority of section 4(f) of the Natural Gas Act,

related to a specific facility put into service after August 8, 2005, may apply for market-based rates by complying with the following requirements:

(1) The storage service provider must demonstrate that market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

(2) The storage service provider must provide a means of protecting customers from the potential exercise of market power.

(b) Any storage service provider seeking market-based rates for storage capacity pursuant to this section will be presumed by the Commission to have market power.